## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CARLA ORTIZ, Individually, and on behalf of
her daughter, J.L., a minor,

              Plaintiffs,

*v.*

BEN STRONG TRUCKING, *et al.*,

              Defendants.

Case No.  1:18-cv-03230-CCB

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO DEFENDANT COWAN SYSTEMS, LLC'S RULE 12(B)(6) MOTION TO DISMISS

**COME NOW** Plaintiffs, by and through undersigned counsel, and respectfully submit their Memorandum of Points and Authorities in Response to Defendant Cowan Systems, LLC's Rule 12(b)(6) Motion to Dismiss. In response thereto, Plaintiffs state the following:

### FACTUAL BACKGROUND AS PLED

1.  Defendant Terry was a truck driver who was employed by Defendant Ben Strong Trucking ("BST"). (ECF Doc. No. 1 at ¶ 25).

2.  Defendants Cowan Systems, Inc., Cowan Systems, LLC, and Cowan Systems Transportation, LLC (the "Cowan Defendants") were acting as an enterprise. Because the contracts between each party are yet to be produced despite pre-suit request, it has been alleged that the conduct was conducted "and/or" by each Cowan Defendant.

3.  The Bill of Lading indicates that "Cowan Systems, Inc." was the motor carrier of the load in question. (ECF Doc. No. 1 at ¶ 48)(Exhibit 1).

4.  The Map-21 legislation made it clear that in order to be a motor carrier or a broker for transportation, an entity must be properly registered accordingly. (ECF Doc. No. 1 at ¶ 42).

5.   49 U.S.C. §13901 requires that every agreement shall specify in writing the authority under which each entity is acting and that it is illegal to secure a shipment as a motor carrier and then to broker the shipment out to a third party. (ECF Doc. No. 1 ¶¶ 43 – 44).

6.   Cowan Systems, Inc. was neither a registered motor carrier nor a registered broker. (ECF Doc. No. 1 at ¶ 17).

7.   Whichever Cowan entity legally contracted with Defendant Ben Strong Trucking, and thereby Defendant Terry, took on both Defendants as statutory employees under the Federal Motor Carrier Safety Regulations. (ECF Doc. No. 1 at ¶¶ 26 – 27; 29; 31 – 44; and 50).

8.   In accepting the contract to haul the Shipment in question, the moving Defendants became complicit in the enterprise of the Cowan Systems Defendants. (ECF Doc. No. 1 at ¶¶ 54 – 59)

9.   Defendant Terry, while acting as an employee of Defendant Ben Strong Trucking and a statutory employee of the Cowan Defendants, was negligent in causing the incident in question. (ECF Doc. No. 1 at ¶¶ 60 – 75).

10.  Plaintiff Ortiz was the driver of one of the cars involved in the incident and her daughter, J.L. was a passenger in that car. (ECF Doc. No. 1 at ¶¶ 60 – 63).

11.  Plaintiff Ortiz was injured in the collision. (ECF Doc. No. 1 at ¶ 80).

12.  Plaintiff J.L. was catastrophically injured in the collision. (ECF Doc. No. 1 at ¶ 80).

13.  In addition to the physical and mental injuries that Plaintiff Ortiz suffered as a result of the incident, the incident also left her trapped in the vehicle with her daughter for a prolonged period of time as she became traumatized by her daughter's pain and health. (ECF Doc. No. 1 at ¶¶ 76 – 82 & 87).

14.  In addition to the physical and mental injuries that Plaintiff J.L. suffered as a result of the incident, the incident also left her trapped in the vehicle with her mother for a prolonged period of

time as her mother did everything in her power to try to keep her daughter alive, and she became traumatized by this ordeal. (ECF Doc. No. 1 at ¶¶ 76 – 82 & 87).

15. Plaintiff has specifically alleged that the Defendants acted with "actual malice and fraud." (ECF Doc. No. 1 at ¶ 168).

16. The fraudulent conduct alleged was set forth in the Complaint from paragraphs 31 – 50 and 56 – 59; specifically, it was stated that the "manner in which CSI, CSL, and/or CST orchestrated the Shipment to be picked up by BEN STRONG was done fraudulently in contravention of the applicable statutes and regulations. (ECF Doc. No. 1 at ¶ 59).

17. As pertains to the moving Defendants, Plaintiffs alleged that a "reasonable inquiry, and even a bare minimalistic inquiry, into the safety record of BEN STRONG by reviewing the SAFER website would have demonstrated that BEN STRONG had an out of service vehicle rate of 40% with a national average of 20.72% and an out of service driver rate of 13.3% with a national average of 4.50%." (ECF Doc. No. 1 at ¶52). What these numbers mean is that 4 out of every 10 times a Ben Strong truck was checked, there existed a problem that required the truck to be stopped when the national average is roughly 2 out of every 10 stops; and 1.3 times out of every 10 stops, the Ben Strong driver was found to be out of compliance with the regulations and was required to stop versus a national average of 0.5 times out of 10. And Ben Strong had only been acting as a motor carrier for less than a year when this collision occurred. The facts as pled establish that Ben Strong was unsafe, dangerous, and incompetent.

18. Plaintiffs have alleged that Defendant Terry "was not in compliance with the FMCSR at the time of the incident." (ECF Doc. No. 1 at ¶ 70). Additionally, Plaintiffs have alleged that "Defendant Terry, and thereby Defendants BEN STRONG, ALLIANCE, BSE, CSI, CSL, CST, [conduct] was . . . reckless, extreme and outrageous, wanton, and unlawfully in violation of the applicable rules and regulations…" (ECF Doc. No. 1 at ¶159).

19. The moving Defendants also fail to acknowledge that at ¶159(g) of the Complaint, Plaintiffs alleged that the moving Defendants "failed to abide by the applicable statues including all relevant State and Federal statutes and regulations," as the FMCSRs were clearly identified throughout the entirety of the Complaint.

20. Plaintiffs have articulated and pled damages that give rise to the damages for which an IIED claim are established, including permanent paralysis of a 13-year girl who now suffers nightmares of the incident so vivid that she awakens afraid of her mom. (ECF Doc. No. 1 at ¶¶ 85 – 90).

### ADDITIONAL FACTS

21. Plaintiffs are not required to plead every fact known in order to satisfy Federal Rule of Civil Procedure 8 and the "*Iqbal/Twombly*" Standard. Nevertheless, since Defendant is attempting to assert an argument based on claims and facts outside the four corners of the Complaint, Plaintiff is compelled to raise the following facts:

22. In less than 1 year of operating as a motor carrier and in approximately 10 months with only 2 trucks, Ben Strong Trucking incurred 12 "out of service" violations.

23. According to the North Carolina Division of Motor Vehicles, Mr. Terry's Class A Commercial Driver's License was issued on June 1, 2018, less than three weeks before this collision. (Exhibit 2).

24. According to the North Carolina Division of Motor Vehicles, Mr. Terry (1) received a speeding citation for 80 MPH in a 70 on 7/25/16; (2) was in an accident in Vance County, NC on 6/9/16; (3) had a restriction placed on his prior CDL to be accompanied by a licensed driver  from February 12, 2016 until August 8, 2016; (4) was in an accident in Vance County, NC on January 29, 2016; and (5) had a restriction placed on his prior CDL to be accompanied by a licensed driver from June 26, 2013 until December 26, 2014.

25. Since the filing of this Complaint, Plaintiffs have been able to obtain documents from GAF Materials via subpoena. According to the production, GAF has "been unable to locate an executed

contract with Cowan Systems, LLC" and "has not been able to locate any documents relating to Cowan Systems, Inc., Cowan Systems Transportation, LLC, or Ben Strong Trucking, LLC." (Exhibit 3).

26. GAF Materials also produced a "system screenshot depicting shipment at issue, REF. 0004358462" which clearly identifies "Cowan Systems, LLC" as the motor carrier of this shipment. (Exhibit 4).

27. GAF Materials also produced an insurance policy face sheet that it had in its file that insured Cowan Systems, LLC for "ANY AUTO." (Exhibit 5).

28. GAF Materials also produced a "Contract Schedule of Rates" for "Carrier Name: Cowan Systems, LLC." (Exhibit 6).

29. The Contract Rate for the Shipment in question in this lawsuit matches the Contract Rate in the "Contract Schedule of Rates" for "Carrier Name: Cowan Systems, LLC."

30. Finally, GAF Materials produced an 18-page spreadsheet of billing records for contract shipments between itself and Cowan Systems, LLC just for the 2018 calendar year, despite a request for the past 10 years' records. (Exhibit 7).

## **STANDARD OF REVIEW**

Defendants have presented this motion before the Court in reliance on Fed. R. Civ. Pro. 12(b)(6) to assert that Plaintiffs have failed to state a claim upon which relief can be granted. In support of their allegation, Defendants have directed this Court to *Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007) and to *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); thereby, presenting the pleading standards established under Fed. R. Civ. Pro. 8. Defendants bring their Motion to Dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) and rely upon *Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007) and to *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Fed. R. Civ. Pro. 12(b)(6) identifies

the affirmative defense of "failure to state a claim upon which relief can be granted." Along with *Iqbal* and *Twombly*, federal court pleading standards are governed by Fed. R. Civ. Proc. 8, which states,

> A pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim, or 3rd-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

(Fed. R. Civ. Pro. 8(a)).

In *Twombly* the Court specifically stated, "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly* at 570. The *Twombly* decision also stated, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations…a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly* at 555. Nevertheless, the *Twombly* decision made clear in citing to *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.Ed.2d 90 (1974) that "a well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely.'" *Twombly* at 556. Thus, the *Twombly* decision did not expand the requirements of the long standing notice-pleading requirements under Fed. R. Civ. Pro. 8, but merely clarified that the notice-pleading must at least allege facts, that while taken true, can formulate the basis for a claim regardless of whether recovery is remote and unlikely. *See also Hutton v. Nat'l Bd. Of Examiners in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018) "Accordingly, 'we accept as true' the 'allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'"

Following the *Twombly* decision, the Court then took up the case of *Ashcroft v. Iqbal.*, 556 U.S. 662, 129 S. Ct. 1937 (2009). The *Iqbal* decision further examined the "plausibility" requirement of pleadings established under *Twombly*. In doing so, the Court stated, "[a] claim has facial plausibility

6

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal* at 1949. The Court went on to state that "[d]etermining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal* at 1950.

While the decisions of *Twombly* and *Iqbal* have given rise to new challenges based upon Fed. R. Civ. Proc. 8 and 12(b)(6), the decisions have not come without scrutiny. The United States Court of Appeals, Second Circuit has stated,

> the notion that *Twombly* imposed a heightened standard that requires a complaint to include specific evidence, factual allegations in addition to those required by Rule 8, and declarations from the persons who collected the evidence is belied by the *Twombly* opinion itself. The Court noted that Rule 8(a)(2) of the Federal Rules of Civil Procedure "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests,"…The *Twombly* plausibility standard, which applies to all civil actions, *see Iqbal*, 129 S.Ct. at 1953, does not prevent a plaintiff from "pleading facts alleged 'upon information and belief'" where the facts are peculiarly within the possession and control of the defendant, *see Boykin v. KeyCorp*, 521 F.3d 202, 215 (Second Cir. 2008), or where the belief is based on factual information that makes the inference of culpability plausible, *see Iqbal*, 129 S.Ct. at 1949.

*Arista Records LLC v. Doe 3*, 604 F.3d 110, 119 – 120 (2010)(internal citations omitted). The *Arista* court went on to state, "although *Twombly* and *Iqbal* require 'factual amplification [where] needed to render a claim plausible,' we reject Doe 3's contention that *Twombly* and *Iqbal* require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista* at 120 (internal citations omitted).

The United States Court of Appeals for the Seventh Circuit has likewise addressed the confusion raised by the *Twombly* and *Iqbal* decisions:

> The Court's specific concern in *[Twombly]* was with the burden of discovery imposed on a defendant by implausible allegations perhaps intended merely to extort a settlement that would spare the defendant that burden. In *Iqbal* it was with the inroads

> into the defense of official immunity-which is meant to protect the officer from the
> burden of trial and not merely from damages liability-that allowing implausible
> allegations to defeat a motion to dismiss would make…. Thus, as the Court said in
> *Iqbal*, "determining whether a complaint states a plausible claim for relief will … be a
> context-specific task that requires the reviewing court to draw on its judicial experience
> and common sense…. In other words, the height of the pleading requirement is
> relative to circumstances.

*Cooney v. Rossiter, et al.*, 583 F.3d 967, 971 (2009). Additionally, the United States District Court of the Eastern District of Pennsylvania has even gone so far as to refuse to extend the *Iqbal* standard on the basis of it being dicta: "The Court disagrees because notice pleading is sufficient and fact pleading is not required. . . . Plaintiffs' claims are plausible if they were discriminated against by defendants. . . . The Court is unwilling to extend the dictum of the *Iqbal* decision to the present case." *Butt v. United Brotherhood of Carpenters & Joiners of America, et al.*, 201 WL 2080034 (E.D.Pa.).

Thus, in light of *Twombly, Iqbal*, and their progeny, the appropriate standard for a Rule 12 motion to dismiss provides that a Complaint must be dismissed ***ONLY*** if it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Twombly* at 570. All reasonable factual inferences must be construed in Plaintiffs' favor, and all allegations in the complaint are presumed true; however, the Court is not required to accept inferences not based on facts cited in the Complaint. *S.S. v. Howard Road Academy*, 562 F. Supp. 2d 126, 129 (2008) citing *Kowal v. MCI Communications Corp.*, 305 U.S. App. D..C. 60, 16 F.3d 1271, 1276 (D.C. Cir. 2004). Therefore, all that a plaintiff must do in the Complaint to defeat dismissal is to "raise factual allegations which raise a relief above the speculative level." *Id.* citing *Twombly* at 1965, and to "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Iqbal* at 1937, citing *Twombly*. The Plaintiffs' complaint contains several pages of factual content, which provides the court with a timeline of the Defendants' alleged misconduct. Plaintiff has more than met the legal standard to survive dismissal.

With the facts as alleged in the Complaint, it must be remembered that all of the allegations need to be taken as true. Defendant does not even suggest that the allegations, as alleged, are not true. In fact, discovery is beyond doubt necessary to resolve the legal and factual issues.

## LEGAL ARUGMENT

I.  **DEFENDANT'S MOTION IS PREDICATED ON FACTS OUTSIDE OF THE COMPLAINT THAT MUST BE ADDRESSED THROUGH DISCOVERY BEFORE THE COURT SHOULD CONSIDER THE ARGUMENTS PRESENTED.**

Defendant predicates its entire argument on the assertion that "Cowan LLC was operating as a property broker, as defined under 49 U.S.C. § 13102(2), by selecting and contracting with Ben Strong as the carrier to transport the shipment of shingles. (Compl. ¶ 36, 50, 132)." (ECF Doc. No. 12-1 at 1 – 2). The cited paragraphs, however, do not expressly agree with such a proposition.

Plaintiffs alleged at ¶ 20 of the Complaint that this Defendant "is registered as a 'Motor Property Contract Carrier,' 'Property Broker,' and a 'Motor Property Common Carrier.'" Furthermore, as alleged in ¶¶46 and 48 of the Complaint, the Packing Slip and Bill of Lading for the Shipment were accepted by Defendant Cowan Systems, Inc.

As alleged at ¶43 of the Complaint, 49 U.S.C. §13901(c)[1] specifically requires that '[f]or each agreement to provide transportation or service for which registration is required under this chapter, the registrant shall specify, in writing, the authority under which the person is providing such transportation.'" Not only was this this paragraph alleged, but it is the law and it cannot be refuted. While Plaintiffs have issued a subpoena upon GAF Materials, the shipper, to acquire all contracts between GAF Materials and the named Defendants – and specifically the Master Transportation Agreement at play in this matter – it is this Moving Defendant who should be in possession of this

---

[1] Plaintiffs recognize that there was a typo in the Complaint indicating the citation to be "49 U.S.C. §1390(c)," but the Complaint is still clear that said citation was clearly identified as the MAP-21 legislation.

document and should be able to bear light on the contractual terms.[2] Such documents have now been produced by GAF Materials, and, as stated above, all such documents recognize ONLY Cowan Systems, LLC as the motor carrier. Cowan Systems, Inc. has filed a Motion to Dismiss under the argument that it was not in existence at the time of this incident, and yet Cowan Systems, LLC is acknowledging that it played some role in this shipment. It would appear that the Moving Defendant is glossing over facts in order to make its own legal conclusion that it was acting legally as a property broker in this matter.

Defendant also ignores ¶49 of the Complaint that plausibly alleges that Cowan Systems, Inc. "held itself out to GAF and the public as [sic] large as the motor carrier of the Shipment." If the Moving Defendant is taking the position that it was the broker in this matter, then it appears that it brokered the shipment to CSI, who claims that it was not in existence at the time. What appears to be more likely given the posture of this case is that as a registered motor carrier, GAF actually contracted with the Moving Defendant to be the motor carrier and made a typo on its Bill of Lading and Packing Slip, and all of its other internal documents. Regardless, Plaintiffs have alleged facts and causes of action that sufficiently give rise to plausible claims against Cowan Systems, LLC as either a motor carrier or a broker. Defendant's Motion is silent on any claims asserted against Cowan Systems, LLC as the motor carrier.

Discovery is required to determine which hat Cowan System, LLC was wearing, and Defendants bald assertion that it was acting as a broker, removes this motion from the four corners of the Complaint to allow a 12(b)(6) motion to be granted. Even the cases relied upon by Defendant in support of its position were ruled upon at the motion for summary judgment stage, not under a

---

[2] Since the time Defendant has filed its motion, GAF has produced records under the subpoena. As noted in Exhibit 3, GAF acknowledged that "[a]t this time we have been unable to locate an executed contract with Cowan Systems, LLC." Additionally, the screenshot depicting the shipment at issue also further identifies "Cowan Systems, LLC" as the "Motor Carrier." (Exhibit 4).

Rule 12(b)(6) standard. Plaintiffs have more than adequately met their pleading requirements on this matter and the Court should deny this motion; however, should the Court be somewhat persuaded to believe that Cowan was acting as a broker, the Court should only defer its ruling on this matter until the close of discovery as it is clear that discovery is needed to specify what authority was being utilized by Cowan Systems, LLC.

## II.   THE FEDERAL MOTOR CARRIER SAFETY REGULATIONS DO NOT ALLOW MOTOR CARRIERS TO ESCAPLE LIABLITY THROUGH THE USE OF "INDEPENDENT CONTRACTORS."

### a.   The FMCSRs and MAP-21 Legislation Reject The Notion That Motor Carriers Are Not Liable For Independent Contractors.

Pursuant to 49 U.S.C. §390.1(e), an employee "includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle), a mechanic, and a freight handler." (Compl. At ¶ 33). As such, a motor carrier's liability is not governed by traditional common law doctrines of *respondeat superior*, and a motor carrier is vicariously liable for the acts of a statutory employee. (*See Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 38 – 39(2002) "The FMCSR preempts state law in tort actions in which a member of the public is injured by the negligence of a motor carrier's employee while operating in interstate carrier vehicle…Instead, an interstate carrier is vicariously liable as a matter of law under the FMCSR for the negligence of its statutory employee drivers.")

As stated in Plaintiffs' Complaint, the fundamental purpose of the Federal Motor Carrier Safety Regulations ("FMCSR") is to promote safety and to prevent fatalities and injuries to the public at large. (Compl. At ¶ 31). Before analyzing the case law on the application of "statutory employment," it is important to have a clear understanding of the legal definitions relevant to the issue:

- 49 U.S.C. §390.1(e) requires that "[e]very employer shall be knowledgeable of and comply with all regulations contained in this subchapter which are applicable to that motor carrier's operations." (Compl. At ¶ 32).

11

- 49 U.S.C. §390.5 defines an "Employee" as "any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety. Such term includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle), a mechanic, and a freight handler." (Compl. At ¶ 33).

- 49 U.S.C. §390.5 defines an "Employer" as "any person engaged in a business affecting interstate commerce who owns or leases a commercial motor vehicle in connection with that business, or assigns employees to operate it…" (Compl. At ¶ 34).

- 49 U.S.C. §13102(14) defines a "motor carrier" as "a person providing motor vehicle transportation for compensation." (Compl. At ¶ 35).

- 49 U.S.C. §13102(2) defines a "broker" as "a person, **_other than_** a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." (Compl. At ¶ 36)(Emphasis added).

- 49 C.F.R. §371.2(a) defines a "broker" as "a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. **_Motor carriers…are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport._**" (Compl. At ¶ 37)(Emphasis added).

- 49 C.F.R. §371.7(a) states that a "broker shall not perform or offer to perform any brokerage service (including advertising), in any name other than that in which it is registration issued" and section (b) states that a "broker shall not, directly or indirectly, represent its operations to be that of a carrier." (Compl. At ¶38).

- 49 C.F.R. §371.2 restricts motor vehicle carriers to act as a "broker" if they have accepted and legally bound themselves to transport a shipment in stating that, "**_[m]otor carriers_**, or persons who are employees or bona fide agents of carriers, **_are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport._**" (Compl. At ¶ 39)(Emphasis added).

In 2012, the Moving Ahead for Progress in the 21st Century Act ("MAP-21") was enacted in furtherance of the Federal Motor Carrier Safety Administration's core principles. (Compl. At ¶ 40). "Many of the provisions in MAP-21 track the Agency's strategic framework to improve commercial motor vehicle (CMV) safety by supporting [the FMCSA's] three core principles: 1. Raise the bar to enter the industry and operate on our roads; 2. Hold motor carrier and drivers to the highest safety

standards to continue operations; and 3. Remove the highest risk drivers, vehicles, and carriers from our roads and prevent them from operating." (https://www.fmcsa.dot.gov/mission/policy/map-21-moving-ahead-progress-21st-century-act) (last visited January 29, 2019) (Compl. At ¶ 41).

The MAP-21 legislation made clear, among other things, that in order to be a motor carrier or a broker for transportation a person/entity must be registered accordingly. (Compl. At ¶42). 49 U.S.C. §13901(c) specifically requires that "*[f]or each agreement* to provide transportation or service for which registration is required under this chapter, *the registrant shall specify, in writing, the authority under which the person is providing such transportation or services.*" (Compl. At ¶ 43)(Emphasis added). 49 U.S.C. §13901(c) prohibits an entity from representing itself as a motor carrier in order to secure a shipment and then to broker the shipment out to a third party. Such a practice is known as "double brokering" and is illegal. (Compl. At ¶44).

David Nissenberg described the statutory employee doctrine in a treatise on the law of commercial trucking:

> The interstate trucking industry in the United States operates in large part through the use of leased vehicles. Many motor carriers engaged in the transportation of goods between states do not actually own more than a small portion of their fleets. In order to make up the difference, therefore, between what they own and what they need to carry out their transportation requirements, these trucking companies lease heavy-duty trucks and the services of their operators or the operator's employees from independent truckers who own and operate their own trucks. Typically, the owner-operator is paid a percentage of the amount received by the carrier-lessee from the shipper for moving the cargo. Out of this amount, he pays for his costs of operation. Under this arrangement, the independent owner-operator operates under the ICC or DOT authority granted to the carrier-lessee and performs the duties of picking up and delivering cargo which had been agreed to by the carrier-lessee and shipper as set forth in the freight bill or bill or lading covering the movement of a particular load.
>
> The vehicle lease arrangement, which often covers a trailer as well, is carried out under the provisions of written leases, the terms of which have been mandated by the rules and regulations of the Interstate Commerce Commission, still in effect notwithstanding the abolition of the Interstate Commerce Commission.
>
> . . .

13

These DOT leasing regulations place full responsibility for the control of the leased vehicles, equipment, and drivers on the carrier-lessee and is an obligation which may not be contracted away or delegated to another party. This has the effect of making the owner-lessor and his driver or other employees the statutory employees of the carrier-lessee during the term of the lease. The carrier-lessee then becomes vicariously liable as a matter of law for the actions of its statutory employees in the operation of the truck.

Nissenberg, at § 7.16, pp. 401-04.

*Crocker v. Morales-Santana*, 854 N.W.2d 663, 669-670 (2014).

Under the statutory and regulatory framework in existence since the enactment of the MAP-21 legislation *after Schramm*, if an entity is registered as both a motor carrier and a broker, there *must* exist an agreement in writing that specifies under which authority the entity is operating. 49 U.S.C. §13901(c) and if a motor carrier accepts a load from a seller/shipper, that motor carrier is responsible and liable for the safe delivery of that load regardless if it farms it out to another motor carrier.

In this case, as pled, the only facts that exist are that Cowan Systems accepted the load from GAF and is therefore responsible and liable for the safe delivery of that load, regardless of the fact that it contracted with Ben Strong Trucking.

> **b.  *Schramm* Is No Longer Good Law In Light Of The MAP-21 Legislation, And, To The Extent This Court May Determine It Is, It Is Not Applicable To This Case.**

Defendant erroneously argues that *Schramm v. Foster*, 341 F. Supp. 2d 536 (D. Md. 2003) stands for the proposition that this Court "has rejected the argument that a driver employed by a carrier is a 'statutory employee' of the third-party broker under 49 C.F.R. § 390.5."[3] (ECF Doc. No. 12-1 at 5). *Schramm*, however, was a ruling made at the close of discovery in response to a summary judgment motion that dealt with a defendant who was solely a broker and did not act as a motor carrier, and

---

[3] While true that Judge Motz did grant the defendants *motion for summary judgment* in *Schramm*, that is but one opinion on the matter and it is certainly distinguishable from the present case as Defendant even cites in its next sentence that "this Court found that the 'statutory employee' definition only applies to motor carriers," (ECF Doc. No. 12-1 at 5) and, as stated *infra.*, Cowan Systems, LLC is in fact a motor carrier.

was issued before the MAP-21 legislation "specificity requirement" under 49 U.S.C. §13901(c). When analyzing the "statutory employment" argument (pre-MAP-21), it is of the utmost importance for the Court to recognize that *Schramm* was raised procedurally as a motion for summary judgement after discovery had concluded. Arguing *Schramm* at this procedural posture is an unfair analysis as the opinion in *Schramm* weighed heavily upon the facts in that case. Likewise, in *Sperl v. C.H. Robinson Worldwide, Inc.*, 946 N.E. 2d 463(2011) the factual determination of the liability of C.H. Robinson as a broker fell in the favor of Plaintiff, but again, such an opinion was rendered subsequent to discovery of the facts under a motion for summary judgment standard.

In *Schramm*, Jasper Products, LLC requested that C.H. Robinson "arrange for transportation" of a shipment. *Schramm* 341 F. Supp. 2d at 540. Such an arrangement appeared to have indicated that C.H. Robinson was operating as a broker pursuant to 49 U.S.C. §13102(2). C.H. Robinson had a pre-existing contract with Groff Brothers to act as a motor carrier for shipments that C.H. Robinson was brokering. *Id.* C.H. Robinson contacted Groff, who accepted the shipment; thereby becoming the "motor carrier" pursuant to 49 U.S.C. §13102(14). Groff then assigned Foster as the driver of the shipment. A tragic collision resulted.

In this case, under the facts known and pled, GAF Materials contracted Cowan Systems, Inc. to be the motor carrier of the shipment; thereby making Cowan Systems, Inc. liable for the delivery of the shipment as the motor carrier. (Compl. At. ¶45). Cowan Systems, Inc. was not a licensed or registered motor carrier or broker. (Compl. At ¶17). Cowan Systems, Inc., Cowan Systems, L.L.C., and/or Cowan Systems Transportation, L.L.C. then contracted with Ben Strong Trucking to deliver the shipment. Ben Strong Trucking accepted the shipment and assigned Mr. Terry as the driver of the shipment. (Compl. At. ¶¶49 – 50). Assuming these facts to be true, as required under the pleading standards, the Cowan Defendants ARE the motor carrier of the Shipment and the notion that any Cowan Defendant was a broker must be ignored as contrary to the facts alleged.

As noted in *Schramm*, "Robinson describes its business in the following manner: C.H. Robinson . . . is a third party logistics "3PL" company that specializes in brokering the shipment of goods via truck, rail, ocean and air. *C.H. Robinson does not own transportation equipment* (trucks, trains, ships or aircraft). . ." *Id.* at 541(Emphasis added).

As a result of having the benefit of discovery, the Court took note that the president of Jasper and its employee believed that C.H. Robinson was an "intermediary" that found trucks and was a "truck broker." *Id.* at 549. The Court next took note that it was not determinative of the role of an entity in so far as an entity may possess a "motor carrier" license, but instead the question must be looked at in regard to each case individually. *Id.* Of great importance in the analysis of *Schramm* is that as a result of discovery the Court was able to determine that, ***"[a]lthough there is no written contract memorializing the agreement between Jasper and Robinson***, plaintiffs have presented no evidence that Robinson engaged in solicitation of the Jasper load for its own account as a motor carrier." *Id.* at 550 (Emphasis added).

*Schramm*, thus, demonstrates the precise reason for the enactment of the MAP-21 legislation: to require specificity and clarity to the roles that entities assume in conducting interstate commerce and "to improve commercial motor vehicle (CMV) safety by supporting [the FMCSA's] three core principles: 1. Raise the bar to enter the industry and operate on our roads; 2. Hold motor carrier and drivers to the highest safety standards to continue operations; and 3. Remove the highest risk drivers, vehicles, and carriers from our roads and prevent them from operating." (https://www.fmcsa.dot.gov/mission/policy/map-21-moving-ahead-progress-21st-century-act) (last visited January 29, 2019) (Compl. At ¶ 41).

Contrary to the facts in *Schramm*, according to the U.S. DOT Safety Measurement System, Cowan Systems, LLC owns and operates 1,937 vehicles and employs 2,173 drivers. Of the three different Cowan entities named in this suit, Cowan Systems, LLC is the only one licensed and

registered as a broker. Nevertheless, GAF Materials identified both on the Bill of Lading and the Packing Slip Cowan Systems, INC. as the motor carrier. (Compl. At ¶¶ 46 – 48). While *Schramm* indicated that the mere existence of the "broker's" name on the Bill of Lading does not prove that it was in fact the carrier, *Schramm* was issued prior to the specificity rule of 49 U.S.C. §13901(c). Without the contract between GAF Materials and the Cowan entity that arranged this shipment – either as a broker or motor carrier – the facts as pled in the Complaint clearly establish that the Cowan Defendants accepted this shipment *as the motor carrier*.[4]

Plaintiffs have alleged facts sufficient to establish that Defendants Terry and Ben Strong Trucking were statutory employees of Defendant Cowan Systems, LLC. (Compl. ¶¶ 26, 27, 29, and 31-59). Defendant Cowan Systems, LLC's Motion simply ignores the entire argument under Count I of the Complaint that Defendants Terry and Ben Strong were acting as statutory employees of Defendant Cowan Systems, LLC.

Both the Packing Slip and the Bill of Lading indicate that the motor carrier for this load was Cowan Systems, Inc. Cowan Systems, Inc. is not registered as either a motor carrier or a broker. (Compl. At ¶17). Cowan Systems, LLC is registered as a motor carrier. (Compl. At ¶ 20). It would appear to be wholly illegal for Cowan Systems, Inc. to have accepted the shipment from GAF as a motor carrier, since it was not registered to do so. However, those are the facts that were available to the Plaintiffs at the time the Complaint was filed since the Cowan Defendants refused to produce documentation pertaining to this Shipment prior to suit being filed. There are far too many unanswered questions regarding the contractual relationship between all of these parties to simply

---

[4] According to ECF Doc. No. 19-2, Cowan Systems, Inc. has not conducted any business activities since May 1, 2000 and Cowan Systems Transportation, LLC ceased all business in 2010. Again, Plaintiffs argue that discovery is required to identify which authority the Cowan Defendant who contracted with GAF was acting under; however, it appears, based upon the affidavits, that GAF was contracting with Cowan Systems, LLC.

accept Defendant's statement that it was acting as a broker *ipse dixit*. That is why Plaintiffs were compelled to allege Counts I – III as alternative theories.

- Count I implicates this Defendant as a statutory employer of Ben Strong and Mr. Terry to the extent that Defendant Cowan Systems, LLC was responsible for the actions of its employees.

- Count II implicates this Defendant as a statutory employer who negligently selected and hired Ben Strong and Mr. Terry under the theory that Cowan Systems, LLC was operating under its "motor carrier" registration.

- Count III implicates this Defendant to the extent that the contracts would demonstrate that Cowan Systems, LLC was operating under its "broker" registration.

It is anticipated that Defendant Cowan Systems, LLC may make the argument in reply that absent a leasing agreement it should be absolved from liability as a statutory employer. *Puga v. About Tyme Transp., Inc.*, 227 F. Supp. 3d 760 (2017) is instructive on this matter:

> whether the drivers are called direct employees, independent contractors, or owner-operators—if the carrier hires them to transport a shipment, they are the carrier's statutory employees and the carrier has statutory control over the equipment and the driver to support vicarious liability.

*Puga v. About Tyme Transp., Inc.*, 227 F. Supp. 3d at 763.

*Puga* went on to address the language of the statute[5] as pertains to "leases," by indicating that, "the only time that the statute includes the term 'lease' is in the heading. The body of the statute refers to the 'arrangements,' rather than a 'lease.' The implication is that the necessary relationship exists, whether or not it is termed a 'lease.' It is the fact of 'use' that triggers the vicarious liability imposed by the Motor Carrier Act." *Puga* 227 F. Supp. 3d at 764.

---

[5] The statute in question is 49 U.S.C. § 14102(a):

(a) **General authority of Secretary**. — The Secretary may require a motor carrier providing transportation subject to jurisdiction under subchapter I of chapter 135 that *uses* motor vehicles not owned by it to transport property under an *arrangement* with another party to—

(1) make the arrangement in writing signed by the parties specifying its duration and the compensation to be paid by the motor carrier;

(2) carry a copy of the arrangement in each motor vehicle to which it applies during the period the arrangement is in effect;

(3) inspect the motor vehicles and obtain liability and cargo insurance on them; and

(4) have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier.

As pled, the Cowan Defendants, including Cowan Systems, LLC, accepted the shipment from GAF as a motor carrier and then contracted to *use* Ben Strong to deliver the load. In accepting the contract from GAF as the motor carrier, Defendant Cowan Systems, LLC assumed all liability for the delivery of that shipment, whether it utilized one of its own 1,937 vehicles and 2,173 drivers or one of its contracted "independent contractors." Either way, Plaintiffs have met their pleading requirements under *Iqbal/Twombly* and the motion should be denied.

## III.   PLAINTIFFS' CLAIMS ARE NOT PREEMPTED

### Statutes, Regulations, and Agencies

In order to clarify the issues involved in this mater, the following is a brief summary of the federal statutes, regulations, and agencies at issue:

- The Federal Aviation Administration Authorization Act, or "FAAAA," is a statutory scheme that governs certain aspects of the freight transportation industry, including *prices, routes and services*. The FAAAA does contain the preemption language that Defendant Cowan Systems, LLC cites to, however, it is inapplicable to this case. 49 U.S.C. §14501(c)(1). This same subsection of the FAAA also provides that it does **not** preempt or restrict the ability of states to govern *safety issues* and states "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." 49 U.S. C. § 14501(c)(2)(A).

- A different regulatory scheme known as the Interstate Commerce Termination Act, or "ICCTA," contains the same preemption provision.[6] Accordingly, some courts refer to the FAAAA, and some refer to the ICCTA. For purposes of this analysis, there is no difference; case law referring to one is applicable to the other.

- Both the FAAA and the ICCTA preemption provisions adopt the preemption provision found in the Airline Deregulation Act of 1978, or "ADA."

- The "FMCSA" refers to the Federal Motor Carrier Safety Administration. This agency makes safety data regarding motor carriers public and publishes the "FMCSRs," which are the Federal Motor Carrier Safety Regulations, 49 C.F.R. pt. 390, *et seq.*

---

[6] *Compare* ICCTA, 49 U.S.C. § 14501(b)(1) *with* FAAA, 49 U.S.C. § 14501(c)(1).

### a. Plaintiffs' Claims Are Not Preempted.

Defendant Cowan Systems, LLC has the burden of proof as the movant on a Rule 12(b)(6) motion and the party seeking to invoke preemption. *J.O.C. Farms, L.L.C. v. Fireman's Fund Ins. Co.*, 737 Fed. Appx 652, 654 (2018). The United States Supreme Court instructs that when determining whether a particular filed of law is preempted, the interpretation must start with the presumption that preemption is not intended. *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 – 55(1995); *see also Altria Grp., Inc. V. Good*, 555 U.S. 70, 76(2008); *Wyeth v. Levine*, 129 S.Ct. 1187, 1194-95 (2009); *see also Nyswaner, et al. v. C.H. Robinson WorldWide Inc., et al.* 2019 U.S. Dist. LEXIS 1048, *4, 2019 WL 95896: "When analyzing Congressional intent, courts must be 'mindful of the adage that Congress does not cavalierly preempt state law causes of action.' *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007); *See also Hentz v. Kimball Transp., Inc.*, 2018 U.S. Dist. LEXIS 193952, *8. This is particularly true where 'Congress neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct.' *United Constr. Workers v. Laburnum Constr. Corp.*, 347 U.S. 656, 663-664, 74 S. Ct. 833, 98 L. Ed. 1025 (1954)".

In this context, "safety" has traditionally been within the states' police powers that are presumed not to be preempted by federal law. *Hillsborough Cnty. V. Automated Med. Lab.*, 741 U.S. 707, 715 (1985).

Defendant Cowan Systems, LLC has not and cannot overcome the strong presumption against preemption.

### b. The Overwhelming Majority Of Cases Hold That The FAAAA Does *NOT* Preempt Personal Injury Claims Against Freight Brokers.

While Defendant references a few outlier cases that have interpreted the preemption provision in the manner they wish it to be, it has failed to even acknowledge that most courts "uniformly have resolved against federal preemption" for personal injury claims. *See, e.g., Jimenez-Ruiz v. Spirit Airlines*,

*Inc.*, 794 F. Supp. 2d 344, 348 (D.P.R. 2011) (quoting *Dudley v. Business Exp., Inc.*, 882 F. Supp. 199, 206 (D.N.H. 1994) (quoting *Margolis v. United Airlines, Inc.*, 811 F. Supp. 318, 322 (E.D. Mich. 1993))(internal citations omitted). There is "near-universal refusal of the courts to find [such] actions preempted." *Montes de Oca v. El Paso-L.A. Limo. Exp., Inc.*, No. CV 14-9230 RSWL (MANx), 2015 WL 1250139, at *1 (C.D. Cal. Mar. 17, 2015) (Emphasis added) (Attached as Exhibit 8). "[C]ourts award damages every day in . . . crash cases, notwithstanding [the FAAAA]." *Bienman v. Chicago*, 864 F.2d 463, 471 (7th Cir. 1988) (referring to airplane crashes, but applies with equal force to crashes involving tractor-trailers under the FAAAA).

The vast majority of recent decisions on the issue have found that the FAAAA does not preempt personal injury and wrongful death claims against freight brokers: *Whitinger, et al. v. C.H. Robinson, et al.*, Case No. CJ-2013-120 (Okla. Trial. Ct. May 9, 2018)[7]; *Mann v. C.H. Robinson Worldwide, Inc.*, Civil Action No. 7:16-cv-00102, Civil Action No. 7:16-cv-00104, Civil Action No. 7:16-cv-00140, 2017 WL 3191516 (W.D. Va. July 17, 2017); *Evans, et al. v. Primoris Servs. Corp., et al.*, Cause No. DC-15-0449, 2018 WL 1427549 (Tex. Trial Ct. June 27, 2017); *Segura, et al. v. C.H. Robinson*, Cause No. C-2572-16-F (Tex. Trial Ct. June 12, 2017); *Sharp v. 68 Transport, LLC, et al.*, Case No. CJ-15-70, 2016 WL 9650516 (Okl. Trial Ct. Sept. 13, 2016); *Morales v. Redco Transp., Ltd.*, No. 5:14-cv-129, 2015 WL 9274068 (S.D. Tex. Dec. 21, 2015); *Montes de Oca*, 2015 WL 1250139, at *1; *Owens v. Anthony*, No. 2-11-0033, 2011 WL 6056409 *2 (M.D. Tenn. Dec. 6, 2011).

In addition, given the adoption of the preemption language in the FAAAA from the ADA, it is instructive to look at the interpretations that have been issued in analyzing the ADA language. As

---

[7] On November 17, 2017, the *Whitinger* Court held that the FAAAA did not preempt a personal injury action against a freight broker. C.H. Robinson sought reconsideration based on the same cases Defendant relies on here, namely *Volkova* and *Krauss*. On May 9, 2018, the *Whitinger* Court denied the motion for reconsideration and affirmed the November 17, 2017 decision. A copy of the November 17, 2017 order and docket entry with respect to the May 9, 2018 decision is attached as Exhibit 9. The other decision set forth in this paragraph that is not available on Westlaw – the *Segura* decision – is also attached as Exhibit 10.

set forth above and discussed more fully below, the FAAAA preemption provision was taken directly from the ADA's preemption provision and, therefore, the overwhelming majority of courts concluded that the ADA cases apply with equal force to FAAAA analysis. In interpreting the language, a great many courts hold that the ADA language does not preempt personal injury claims in the federal aviation context.[8]

Courts across the country reason that preemption of personal injury claims, among other things:

- Would not serve the economic purpose of the FAAAA to maximize air and motor carrier "price, route and services" on "*competitive* market forces"[9] (preemption "was concerned solely with economic deregulation, not with displacing state tort law enforcement of tort remedies for person injury"[10]);

- Would violate the Supreme Court's judicial gloss on § 14501(c)(1) requiring more than a *tangential* relationship to a carrier's "price, route or service"[11] and the long-standing presumption against preemption of state personal injury claims[12] (enforcement of tort

---

[8] *Charas v. Trans World Airlines, Inc.*, 160 F. 3d 1259, 1261 (9th Cir. 1998)(en banc), opinion amended on denial of reh'g, 169 F.3d 594 (9th Cir. 1999) (Discussed below); *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 340 (5th Cir. 1995) (holding personal injury claim resulting from negligence of air carrier is not preempted); *see also Gill v. JetBlue Airways Corp.*, 836 F. Supp.2d 33, 42-43 (d. Mass. 2011) (holding state tort claim was not preempted on the grounds that "enforcement of tort remedies is not sufficiently 'related to' airline services" and "a general rule against [] preemption of personal injury claims sounding in negligence is also consistent with the policy and structure of the statute as a whole"); *Jiminez-Ruiz*, 794 F.Supp.2d 344 (holding personal injury claims based on state's general negligence law not preempted by the ADA); *Stone v. Frontier Airiness, Inc.*, 256 F. Supp 2d 28 (D., Mass. 2002) (holding that wrongful death suit against the airline asserting a claim under state law that the carrier was negligent in failing to have a defibrillator aboard a plane is not preempted by FAAAA); *Vinnick v. Delta Airlines, Inc.*, 93 Cal. App. 4th 859 *2001) (holding that negligence claim against an airline for injuries sustained by luggage falling from an overhead bin is not preempted); *Cartegena v. Cont'l Airlines, Inc.*, 10 F. Supp. 2d 677, 680 (SS.D. Tex. 1997) (same); *Cont'l Airlines, Inc. v. Kiefer*, 920 S.W.2d 274, 281-83 (Tex. 1996) (the ADA does not preempt common-law personal-injury negligence claims); *Seals v. Delta Air Lines, Inc.*, 924 F. Supp. 854, 859 (E.D. Tenn. 1996) (finding no preemption of personal injury claim, relying on the fact that the Supreme Court does not interpret the federal preemption clause to extend to personal injury suits) (citing *American Airless, Inc. v. Wolens*, 513 U.S. 219 (1995)); *Margolis*, 811 F. Supp. At 323 (finding no preemption of personal injury claim under common law negligence because Congress did not provide any remedy for one who suffers injury due to an airline or its employees and reasoning that "Congress has expressed no intent to preempt traditional state law claims for negligence"); *Nyswaner v. C.H. Robinson WorldWide, Inc.* 2019 U.S. Dis. LEXIS 1048, *9-10 ("Negligent hiring claims are generally applicable state common law causes of action that apply to a wide variety of industries. Unlike the regulation at issue in *Rowe*, common law negligence claims for hiring practices are not targeted or directed at the trucking industry. Nor do they operate at the point where Robinson provides services to customers at specific prices, when it agrees to arrange transport for goods with businesses in exchange for a fee…This case does not involve a customer seeking better or different services or rates under state law."). The same logic applies to the case at issue.

[9] *Gill*, 836 F. Supp. 2d at 42 – 43 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992))

[10] *Hodges*, 44 F.3d at 339

[11] *See, e.g., Desardouin v. UPS*, 285 F. Supp. 2d 153, 164 (D. Conn. 2003).

[12] *Altria Grp., Inc.*, 555 U.S. at 76 (analysis of whether preemption applies begins "with the assumption that the historic police powers of States [are] not to be superseded by . . . federal act unless that [is] the clear and manifest purpose of

remedies for personal physical injury ordinarily has no 'express reference' to services [under the FAAAA or ADA]"[13]); and,

- Would run afoul of the "safety savings" provision of the FAAAA (§ 14501(c)(2)), which provides that the preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles"[14] (as the Supreme Court put it, **Congress' clear purpose with § 14501 and the safety savings provision in § 14501(c)(2) was to ensure preemption of states' "*economic*" regulation of motor carriers but not restrict the preexisting and traditional state police power over "*safety regulations*"[15]).**

For example, the Ninth Circuit specifically concluded that Congress did not intend to preempt "run-of-the-mill personal injury claims" with respect to the ADA:

> [Congress] did not intend to immunize the airlines from liability for personal injuries caused by their tortious conduct. Like "rates" and "routes," Congress used "service" in § 13015(a)(1) in the public utility sense – *i.e.*, the provision of air transportation to and from various markets at various times. In that context, "service" does not refer to the pushing of beverage carts, keeping the aisles clear of stumbling blocks, the safe handling and storage of luggage, assistance to passengers in need, or like functions.

*Charas*, 160 F.3d at 1266. After examining the plain language of the preemption clause and the presumption that courts should not supersede the historic police powers of the States unless that is the clear and manifest purpose of Congress, the Ninth Circuit ultimately held that it was the "intent of Congress . . . to deregulate [air and motor carriers], to insulate the industry from possible state economic regulation, and to encourage competition, **but not to immunize . . . from liability for personal injuries** caused by their tortuous conduct." *Id.* (Emphasis added).

The Ninth Circuit affirmed the continuing vitality of *Charas* after the Supreme Court's decision in *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008), observing that "[c]ontrary to [d]efendants' argument, *Rowe* did not represent a significant shift in FAAAA jurisprudence." *Dilts v. Penske Logistics, LLC,* 769 F.3d 637, 645 (9th Cir. 2014). *Dilts* further instructed:

---

Congress" and "when the test of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors preemption")(internal citations omitted).
[13] *Hodges*, 44 F.3d at 340.
[14] 49 U.S.C. § 14501(c)(2); *accord, e.g., Owens*, 2011 WL 6056409, at *2
[15] *City of Columbus v. Ours Garage and Wrecker Serv., Inc.*, 536 US 424, 440 -41(2002)(emphasis in original).

[G]enerally applicable background regulations that are several steps removed from prices, routes, or services, such as prevailing wage laws or safety regulations, are not preempted, even if employers must factor those provisions into their decisions about the prices that they set, the routes that they use, or the services that they provide. Such laws are not preempted even if they raise the overall cost of doing business or require a carrier to re-direct or reroute some equipment. *Mendonca*, 152 F.3d at 1189. Indeed, many of the laws that Congress enumerated as expressly *not* related to prices, routes, or services—such as transportation safety regulations or insurance and liability rules, 49 U.S.C. § 14501(c)(2)—are likely to increase a motor carrier's operating costs. But Congress clarified that this fact alone does not make such laws "related to" prices, routes, or services. Nearly every form of state regulation carries some cost. The statutory text tells us, though, that in deregulating motor carriers and promoting maximum reliance on market forces, Congress did not intend to exempt motor carriers from every state regulatory scheme of general applicability. 49 U.S.C. § 14501(c); *see also, e.g., Rowe*, 552 U.S. at 375 (holding that a state law is not preempted when it "prohibits certain forms of conduct and affects, say, truckdrivers, only in their capacity as members of the public").

Nor does a state law meet the "related to" test for FAAAA preemption just because it shifts incentives and makes it more costly for motor carriers to choose some routes or services *relative* to others, leading the carriers to reallocate resources or make different business decisions.

*Id.* at 646-47. The *Dilts* Court ultimately held that California's meal and rest break laws were not preempted by the FAAAA. *Id.* at 650. On June 22, 2018, the Ninth Circuit upheld *Charas* and *Dilts*, holding that "generally applicable background regulations that are several steps removed from prices, routes, or services are not pre-empted by the FAAAA, even if they raise the overall cost of doing business." *Delivery Express, Inc. v. Sacks*, No. 16-35543, 2018 WL 3081435, at *1-2 (9th Cir. June 22, 2018). The Court specifically rejected the argument Defendant makes here that the applicable law is pre-empted.

Out of concern for judicial economy, this Response does not recite the holdings and reasoning of each of the myriad of decisions across the country holding that the FAAAA does not preempt personal injury and wrongful death claims against freight brokers. Suffice it to say, the federal district courts' respective reasoning in the *Mann* and *Owens* decision are particularly instructive and provide discussion about this body of case law. *Mann*, 2017 WL 3191516l; *Owens*, 2011 WL 6056409. These decisions are attached hereto as Exhibit 11 and 12 respectively.

24

### c. **Defendant's Reliance On *Rowe v. New Hampshire* Is Unavailing**

Without fulling elaborating on *Rowe*, Defendant relies on *Rowe* as the cornerstone of its asserted argument that the FAAAA preempts Plaintiffs' claims as indirectly related to the carrier's rates, routes or services. First, Defendant cites to *Rowe* but largely ignores the requirement stated in *Rowe* "that preemption occurs at least where state laws have a significant impact related Congress' deregulatory and preemption-related objectives." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008). As discussed *infra.*, preemption of these cases is in direct conflict with the Congressional intent of the FAAAA.

Second, the *Rowe* decision involved a cargo claim and is factually distinguished from the claims made by these Plaintiffs. In *Rowe*, the Supreme Court held that two Maine statutes governing the "delivery service" of tobacco products to minors were preempted by the FAAAA. 552 U.S. at 371. The *Rowe* Court reasoned that there was a "direct connection" with motor carrier services because trucking and other motor carrier services make up a "substantial portion of all 'delivery services.'" *Id.* Relying on the ADA preemption analysis with respect to air carriers in *Morales v. Trans World Airlines, Inc.*, the *Rowe* Court stated that federal law does **not**, however, preempt state laws that affect fares in only a "tenuous, remote, or peripheral . . . manner," but did not explain where to draw that line. *Id.* (quoting *Morales*, 504 U.S. at 378).

Since *Rowe*, the Supreme Court has cautioned that (1) "the breadth of the words 'related to' does not mean the sky is the limit;" and (2) the language "with respect to the transportation of property" is ***an additional limitation on the preemption provision of the FAAA that is not in the ADA and that "massively limits the scope of preemption"*** under the FAAAA. *Dan's City Used Cars, Inc. v. Pelkey*, 133 S. Ct. 1769, 17778 (2013) (emphasis added). The Supreme Court's express language that "related to" does not mean the "sky is the limit" is significant, particularly when this Court analyzes the stark factual differences between *Rowe* and this matter.

In *Rowe*, the state statutes at issue were aimed at a specific direct regulation of motor carriers and dictated the specific manner in which they had to deliver tobacco products (e.g., motor carriers had to verify they only delivered to licensed retailers). The statutes were aimed ***directly at the carriage of goods***. Here, by contrast, the state law at issue is the indisputably **general** law of negligence for which **everyone** has a duty to act with reasonable care to avoid foreseeable dangers. It is not, in any way, directed to how the transportation of property occurs or deliver of any goods.

Additionally, assuming the moving Defendant was appropriately acting as a broker in this matter, a verdict against it for negligent hiring may have a remote impact in that it may perceive a financial incentive to avoid similar outcomes in future cases in so far as it decides to alter its methods of selecting motor carriers. The critical feature is that potential tort liability is merely a financial incentive to select safe motor carriers; it imposes no requirement that a freight broker change its pricing, routes, or services. The decisions regarding motor carrier selection remain entirely with the broker. Preemption is concerned with the exercise of governmental power, not persuasion.[16] An award of a jury verdict simply gives one motivation to seek to do better in the future; it does not create a rule of law that would oppress the manner in which business is conducted. The *Rowe* Court specifically concluded that the Maine statutes were, in effect, the State's "**direct substitution** of its own governmental **command** for 'competitive market forces' in determining (to a significant degree) the **services that motor carriers will provide**." *Rowe*, 552 U.S. at 371 (quoting *Morales*, 504 U.S. at

---

[16] Judge Calabresi contrasts the indirect influence exerted on the market by tort law ("general deterrence" ) with governmental regulatory mandates ("specific deterrence"). GUIDO CALABRESI, THE COSTS OF ACCIDENTS 68-129 (1970). The U.S. Supreme Court has acknowledged this view. *See, e.g, Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 186 (1988) ("Congress may reasonably determine that incidental regulatory pressure is acceptable, whereas direct regulatory authority is not."); *English v. Gen. Elec. Co.*, 496 U.S. 72, 85 (1990) (the **effect** of **tort awards "is neither direct nor substantial enough to place petitioner's claim in the pre-empted field"**)(emphasis added); *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251-58 (1984) (vesting federal agency "with exclusive regulatory authority over the safety aspects of nuclear development" was not inconsistent with allowing plaintiffs to recover for injuries caused by nuclear hazards). Justice Blackmun later described the import of these decisions: "The level of choice that a defendant retains in shaping its own behavior distinguishes the indirect regulatory effect of the common law from positive enactments such as statutes and administrative regulations." *Cipollone v. Ligget Grp., Inc.*, 505 U.S. 504, 536-37 (1992) (Blackmun, J., dissenting in part).

378)(emphasis added). Negligence claims for personal injury do not command freight brokers to change how they provide specific services, and certainly not to a "significant degree."

Finally, as set forth above, the *Dan's City Used Cars* Court concluded that FAAAA preemption is "massively limited" by the "transportation of property" requirement. Negligence and Negligent Hiring claims are about providing compensation for past failure to *use due care* in selecting a carrier or driver; they do not regulate the transportation of property. Accordingly, Defendant's argument to the contrary would require the Court to mistakenly sweep catastrophic trucking crash cases away with a broad brush of FAAAA preemption that is not supported by the Congressional intent of the FAAAA and is defied by the preemption exception set forth in the express language of 49 U.S.C. § 14501(c)(2). The absurd result would be to force catastrophically injured victims and millions of dollars to the already overburdened state Medicaid systems instead of holding the responsible party accountable for its alleged negligence.

### d.  <u>ADA Cases Mandating No Preemption Of Personal Injury Claims Apply With Equal, If Not Greater, Force.</u>

The Court made it unmistakable that cases interpreting the nearly identical statutory language of the ADA preemption provision must be followed when interpreting the FAAAA preemption provision. *Rowe*, 552 U.S. at 370 (noting the FAAAA/ICCTA preemption language mirrors that of the ADA). *Rowe* specifically instructs: "when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well." *Id.* The Court further instructed that interpretation of the ADA's preemption provision must be followed when interpreting the similar language of the FAAAA. *Id.* at 370 (holding Congress drafted the FAAAA's preemption provisions "fully aware of [the U.S. Supreme Court's] interpretation of that language"). There can be no legitimate doubt that cases holding that personal injury and wrongful death claims are not preempted by the ADA apply with equal force here. *Id.*; *see, e.g., Morales*, 504 U.S. at 387; *see also Factory Mut. Ins. Co. v.*

*One Source Logistics, LLC*, No. LA CV16-06385 JAK(JPRx), 2017 WL 2608867, at *5 (C.D. Cal. May

5, 2017). Because the FAAAA preemption provision is *even more limited* than that of the ADA, as set

forth *supra.*, (FAA preemption is "massively limited" by the "transportation of property" requirement

that is not provided in the ADA preemption provision), there is even more reason to find that personal

injury and wrongful death claims are not preempted by the FAAAA.

   e.   **The FAAAA Safety Exception Prevents Preemption Here.**

   Assuming *arguendo* that Plaintiffs' claims here do satisfy paragraph (1) of the FAAAA

preemption provision regarding "services," which they do not, the Court must still evaluate the

application of the "safety exception" found in paragraph (2):

   2)  Matters not covered. Paragraph (1)—

> (A) ***shall not restrict the safety regulatory authority of a State
> with respect to motor vehicles***, the authority of a State to impose
> highway route controls or limitations based on the size or weight of
> the motor vehicle or the hazardous nature of the cargo, or the authority
> of a State to regulate motor carriers with regard to minimum amounts
> of financial responsibility relating to insurance requirements and self-
> insurance authorization;

49 USCS § 14501.

   The Plaintiffs claims would not be preempted because they clearly fall within the "safety

regulatory authority concerning motor vehicles" exception in paragraph (2)(A) of the statute. 49 U.S.C.

§14501(c)(2)(A). *See, e.g. Owens*, 2011 WL 6056409, at *3; *see also Morales v. Redco Transp. Ltd.*, No. 5:14-

cv-129, 2015 WL 9274068 (S.D. Tex. Dec. 13, 2016) (denying broker's motion to dismiss based on

FAAAA preemption and adopting reasoning of *Owens*). In *City of Columbus v. Ours Garage and Wrecker

Serv., Inc.*, the Supreme Court stated that, with respect to the FAAAA, Congress' clear purpose was

"state *economic* regulation" and not to restrict the preexisting and traditional state police power over

"*safety* regulations," including ones that govern motor carriers of property. 536 U.S. 424, 429-441

(2002) (emphasis in original).

The safety exception plainly applies to the safety regulatory authority of a state "with respect to motor vehicles." *See* 49 U.S.C. § 14501(c)(2)(A). To the extent that there is any doubt that the claims at issue here concern motor vehicles, the FAAAA's safety regulatory exception only matters if there has first been a determination that the claims at issue satisfy the preemption provision. The determination must include a finding that the claims concern the "transportation of property," as set forth above. That the claims concern "transportation of property" for application of the preemption provision, but then would not concern "motor vehicles" for application of the safety exception, would strain all concepts of reality.

Courts across the country have rejected freight brokers' attempts to do so. For example, in *Montes de Oca*, the freight broker argued that the FAAAA preempts personal injury claims because they "are a veiled attempt at regulating the 'services' offered by a freight broker." 2015 WL 1250139, at *1. In rejecting this argument, the *Montes de Oca* Court stated that the U.S. Supreme Court and lower courts have "consistently held that a state's police power for ensuring safety is not preempted by the [FAAAA], and traditional tort actions" are not preempted. *Id.* (citing, *e.g., Morales*, 504 U.S. at 378; *Rowe*, 552 U.S. at 372; *City of Columbus*, 536 U.S. at 426)(internal quotations and full cites omitted).

Again, out of concern for judicial economy, this Response does not provide a summary of each of the many other cases that hold the FAAAA's safety regulatory exception bars preemption of personal injury and wrongful death claims arising out of motor vehicle crashes, including with respect to claims against freight brokers. In short, "[e]ven if the state's negligent hiring claim had a sufficient impact on the price, route, or service of a broker to satisfy Paragraph (1), it would not be preempted because it would fall within the general "safety regulatory" exception of paragraph (2)(A) of the preemption provision. *Mann*, 2017 WL 3191516, at *16-17. As the federal district court held in *Owens*:

> Plaintiffs allege that Defendant [broker] was negligent in *** choosing *** these two transportation companies. These claims involve highway safety issues. *** Accepting the allegations of the Amended Complaint as true, the Court finds that the negligence

29

issues presented here involve highway safety[,] which has been expressly exempted from the preemption statute.

2011 WL 6056409, at *3. On this basis alone, Defendant's motion on preemption should be denied.

### f. *Volkova, Krauss,* and *Miller* Are Without Merit.

*Volkova, Krauss,* and *Miller* are extreme outliers that depart from the nearly unanimous holdings of courts across the country that wrongful death and personal injury claims are not preempted by the FAAAA. Without further explanation, the *Volkova* Court concluded that all of these cases are simply not "convincing." *Volkova v. C.H. Robinson Co.*, No. 16 C 1883, 2018 WL 741441, at *12 (N.D. Ill. Feb. 7, 2018). The *Vokova* Court, however, relied on the Supreme Court's ostensible adoption of a broad interpretation of the term "services" for purposes of FAAAA preemption analysis in *Rowe*, 552 U.S. 364. This reliance is wrong. As set forth above, *Rowe* has nothing to do with wrongful death or personal injury claims; the decision addresses a state law that barred licensed tobacco retailers from employing a "delivery service" unless it followed particular delivery procedures. Whether the term "services" is given a broad or narrow interpretation is not at all relevant where, as here, the claims at issue involve claims of personal injury.

Even if the interpretation of "services" were relevant here, which it is not, when courts have endorsed a broad interpretation of the FAAAA preemption provision, they have done so with the specific end of furthering Congress' aim to "ensure that the States would not undo federal deregulation with regulation of their own." *Morales*, 504 U.S. at 378. While the FAAAA broadly preempts state laws that threaten to under Congress' deregulatory objectives, it does not, broadly or otherwise, support preemption of laws that impose no substantive standard on rates, services, or routes, notwithstanding even substantial indirect economic effects. To the contrary, laws enacted pursuant to the states' traditional police power that impose no such standard, enjoy the traditional presumption against preemption and are sustained notwithstanding their undisputed, indirect economic effects. *Rowe* did

not undo this. In fact, the *Rowe* Court was careful to note, federal law might not pre-empt state laws that affect the fares in only a 'tenuous, remote, or peripheral . . . manner.'" 552 U.S. at 371.

Nor do *Volkova*, *Krauss*, and *Miller* follow the broad interpretation of the safety exemption to FAAAA preemption adopted by the Supreme Court, the Seventh Circuit Court of Appeals, *Id.* at 377-78, and courts across the country. For example, in *City of Columbus*, the Supreme Court instructed that preemption analysis "starts with the assumption that the historic police powers of the States were not to be superseded by the [FAAAA] unless that was the clear and manifest purpose of Congress" and that "the area Congress sought to deregulate was state economic regulation; 'not restrict' the preexisting and traditional state police power over safety." 536 U.S. 424. Likewise, in *N.Y. State Conference of Blue Cross & Blue Shield Plans*, the Supreme Court stated that despite the "opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." 514 U.S. at 654.

Finally, it is worth noting that other courts are not following *Volkova* or *Krauss*. On November 17, 2017, an Oklahoma court held that the FAAAA did not preempt a personal injury action against a freight broker. (Exhibit 9, *Whitinger*, Case No. CJ-2013-120). After *Volkova* and *Krauss* were issued, C. H. Robinson sought reconsideration of the *Whitinger* Court's November 17th ruling. On May 9, 2018, the *Whitinger* Court denied the motion for reconsideration and affirmed the November 17th decision. *Id.* In addition, after *Volkova* and *Krauss* were issued, the Ninth Circuit held that "generally applicable background regulations that are several steps removed from prices, routes, or services are not preempted by the FAAAA, even if they raise the overall cost of doing business or require a carrier to re-direct or reroute some equipment." *Delivery Express, Inc.*, 2018 WL 3081435, at *1-2.

In short, *Volkova, Miller,* and *Krauss* are true anomalies that do not address the safety exception in 49 U.S.C. § 14501(c)(2) and do not provide a basis to depart form the overwhelming majority of

well-reasoned cases holding that FAAAA preemption does not extend to wrongful death and personal injury claims against transportation brokers.

### g. The Explicit And Undisputed Congressional Purpose With Respect To FAAAA Preemption Is Not Implicated Here.

Two preemption principles should guide the Court's analysis: (1) "the purpose of Congress is the ultimate touchstone in every preemption case," and (2) "we start with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Wyeth*, 129 S. Ct. at 1194-95. There is no dispute that Congress enacted the FAAAA preemption provision to foster uniform ***economic*** de-regulation that reflects maximum reliance on competitive market forces. *Rowe*, 552 U.S. at 371-72. The purpose of the FAAAA preemption is "to prohibit state regulation" that would "undo federal deregulation and replace it with regulation of their own; it was not to immunize to brokers or motor carriers from all liability under state law." *Kiefer*, 920 S.W.2d at 282. Personal injury liability does not affect economic deregulation in any more than a potential 'peripheral manner'; and any such effect would be based on the voluntary choice of a freight broker to change its hiring practices; it would not, as set forth above, be the result of state regulation or requirement. Preemption in the context of personal injury and wrongful death claims, however, "would have the perverse effect of immunizing [brokers] – uniquely among virtually all other industries – from the consequences of their own negligence." *See Dudley v. Bus. Express, Inc.*, 882 F. Supp. 199, 207 (D.N.H. 1994).

### h. Preemption Of Personal Injury And Wrongful Death Actions Under The FAAAA Would Undermine The Role Of The States In Our Federalist System.

Providing meaningful legal recourse for those injured by the negligent hiring of incompetent motor carriers is assigned by the Constitution to the States:

> Congress has no power to declare substantive rules of common law applicable in a State whether they be local in their nature or 'general,' be the commercial law **or a part of the law of torts**. And no clause in the Constitution purports to confer such a power upon the federal courts.

*Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (emphasis added). Preemption of state tort remedies results in "a serious intrusion into state sovereignty while simultaneously wiping out the possibility of remedy for the [plaintiffs'] injuries." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 488-89 (1996). Our system of federalism does "not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities . . . To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals." *New York v. United States*, 505 U.S 144, 181 (1992). Courts should therefore "avoid[] unintended encroachment on the authority of the States," by limiting preemption to those circumstances where the court can be certain that Congress has deemed state law an obstacle to the legislative purpose. *CSX Transp. Inc. v. Easterwood*, 507 U.S. 658, 663-64 (1993).

Congress has not expressly preempted or eliminated state tort actions against freight brokers for personal injury and wrongful death. In fact, it expressed the exact opposite with the safety exception to FAAAA preemption clearly set forth in 499 U.S.C. § 14501(c)(2). Congress, of course, knows how to preempt state common law claims expressly as it has demonstrated a number of times "with drastic clarity." *Bethlehem Steel CO. v. N.Y. State Labor Relations Bd.*, 330 U.S 767, 780 (1947) (Frankfurter, J., concurring); *Taylor v. Gen. Motors Corp.*, 875 F.2d 816, 824 (11th Cir. 1989) ("Congress has long demonstrated an aptitude for expressly barring common law actions when it so desires," citing examples). Given importance of the right to seek legal redress for wrongful injury and death, it would be "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by" the negligent conduct of freight brokers. *Silkwood*, 464 U.S. at 251; *see also United Constr. Workers, et al. v. Laburnum Constr. Cop.*, 347 U.S 656, 663-64 (1954) (Where "Congress has neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct," the Court refused preemption that would leave the injured respondent "without recourse or compensation"). As the Fifth Circuit has stated,

"the bar to a finding of preemption is set even higher" where, as here, federal law does not provide a remedy for an injured party. *Demahy v. Actavis, Inc.*, 593 F.3d 428, 435 (5th Cir. 2010). Indeed, to deny any injured family such a fundamental right on the basis of little more than congressional silence and ambiguity would be "spectacularly odd." *Lohr*, 518 U.S. at 491 (plurality opinion).

**IV.     Plaintiffs' Counts IV, V, & VI Were Adequately Pled.**

Plaintiffs have already argued this same matter in their response to Defendants Ben Strong and Terry's Motion for Partial Dismissal. The argument by both parties is the same and so too is Plaintiffs' Response. In an effort to attempt to ascertain some brevity in this response, Plaintiffs fully incorporate their argument on this matter from ECF Doc. No. 15.

**V.     Plaintiffs Have Adequately Pled Punitive Damages.**

Under Maryland law "[p]unitive damages … seek to punish a party 'whose conduct is characterized by evil motive, intent to injure, **or fraud**, and to warn others contemplating similar conduct of the serious risk of monetary liability.'" *Garcia v. Foulger Pratt Development, Inc.*, 854 A.2d 16, 46 (Md. 2003) (quoting *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633 (Md. 1992)) (Emphasis added).  In order to recover punitive damages, the plaintiff must establish actual malice – "'conduct characterized by evil motive, intent to injure, ill will, **or fraud**.'" *Id.* (quoting *Owens-Illinois, Inc.*, 601 A.2d at 652 n. 20) (Emphasis added).

Plaintiffs have adequately and specifically pled conduct of an enterprise conducting a fraudulent scheme. Admittedly, the extent and pattern of that scheme is not fully understood at this time and will be flushed out in discovery. Regardless, in laying out the fraud and deceitful conduct utilized by all the Defendants in order to skirt the Federal Motor Carrier Safety Regulations, Plaintiffs have adequately met their pleading standards to pursue a claim for punitive damages. (ECF Doc. No. 1 at ¶¶ 31 – 59). It is important for the Court to remember that without the fraudulent double-

brokeraging arrangement that existed, the Defendants Ben Strong Trucking and Mr. Terry never would have been transporting this Shipment and the damages never would have occurred.

As the Maryland Court of Appeals stated,

> The purposes of punitive damages relate *entirely to the nature of the defendant's conduct*. Whether the tort occurred before or after [the collision] should not determine whether actual or implied malice [or fraud] is required for allowing an award of punitive damages. Rather, the availability of a punitive damages award ought to depend upon the heinous nature of the defendant's tortious conduct…Thus, punitive damages are awarded in an attempt *to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud*, **and to warn others contemplating similar conduct of the serious risk of monetary liability**. Because the *Testerman-Wedeman* distinction focuses on when the conduct occurred rather than on the nature of the conduct, it has no relationship to the purposes of punitive damages.

*Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 454 - 55 (1992) (Internal citations omitted) (Emphasis added). It is clearly pled in the Complaint that a scheme existed to subvert the required adherence to the rules and regulations pertaining to interstate commerce and that fraud was utilized to procure this Shipment. It is *the nature of the conduct* that all Defendants undertook to fraudulently procure this Shipment and profit off it that is the subject of the claim for punitive damages.

It is therefore unfounded for Defendants to file this instant Motion seeking to dismiss Plaintiffs' punitive damage claim when Plaintiffs' Complaint specifically alleges that Defendants acted with "fraud." Defendants' motion to dismiss ignores the multiple allegations which set forth how Defendants' conduct was deliberate, fraudulent and without regard for Plaintiffs' rights. Defendants are clearly placed on notice of Plaintiffs' prayers for punitive damages as required by Maryland law. Accordingly, Defendants' motion to dismiss punitive damage claims should be denied.

**WHEREFORE** it being clear that Plaintiffs have met their pleading requirements under F.R.C.P. 8 and the relevant case law interpreting such standards, Plaintiffs respectfully requests that this Honorable Court deny Defendant Cowan Systems, LLC's Rule 12(b0(6) Motion to Dismiss. If, however, this Court determines that more facts need to be pled to meet the pleading requirements, Plaintiffs request that time be granted to allow for the amending of the Complaint and/or that any

dismissal of such claims be done without prejudice as the statute of limitations has not yet run and Plaintiffs should be given an opportunity to correct any perceived deficiencies.

Respectfully submitted,

PAULSON & NACE, PLLC

/s/ Matthew A. Nace, Esq.
Matthew A. Nace, Esq. #29684
1025 Thomas Jefferson St., NW
Suite 810
Washington, DC 20007
202-463-1999 – Telephone
202-223-6824 – Facsimile
man@paulsonandnace.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30st day of January, 2019, I caused a true and exact copy of the foregoing to be served via the Court's Online File System for Mssrs. McCloskey, McGavin, and Marshall and by U.S. Mail upon Mssrs. Cook and Bowman upon:

Stephen S. McCloskey, Esq.
Semmes, Bowen & Semmes
Baltimore, MD Office
25 S. Charles Street
Suite 1400
Baltimore, MD 21201
*Counsel for Ben Strong Trucking and Mr. Terry*

Stephen J. Marshall, Esq.
Franklin & Prokopick
24 N. Charles Street
Suite 600
Baltimore, MD 21201
*Counsel for Cowan Systems, Inc. &*
*Cowan Systems Transportation, LLC*

John D. McGavin, Esq.
Bancroft, McGavin, Horvath & Judkins, PC
9990 Fairfax Boulevard
Suite 400
Fairfax, VA 22030
*Counsel for Cowan Systems, LLC.*

Bowman Sales and Equipment, Inc.
C/O Todd A. Bowman
10233 Govrnor Lane Blvd
Williamsport, MD 21795

Alliance Trucking and Logistics, LLC
C/O Winston Cook
10175 Hemlock Way
Jonesboro, GA 30238

/s/Matthew A. Nace
Matthew A. Nace