IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CARLA ORTIZ, *et al.* | Civil Action No. CCB-18-3230 |
| v. | |
| BEN STRONG TRUCKING, INC., *et al.* | |

## MEMORANDUM

This tort action arises out of a June 2018 traffic accident on Interstate 95 in Harford County, Maryland, in which the driver of a tractor trailer operated by defendant Ben Strong Trucking (hired by the Cowan defendants to move a load of roof shingles for GAF Materials) crashed into the back of plaintiff Carla Ortiz's car, which then struck Paul Michael Manion's and Cheryl Manion's car. Then, Ortiz's car struck Cierra Lashae Rice-Wilder's car, and that car struck another tractor trailer. The collisions resulted in physical injuries to the plaintiffs, including permanently debilitating injuries to Ortiz's minor daughter and the death of the Manions' child.

In a June 2019 memorandum and order (ECF 26, 27), this court dismissed the plaintiffs' claims of negligent infliction of emotional distress, intentional infliction of emotional distress, and punitive damages, leaving three claims against Cowan and Ben Strong: Counts I (Negligence), II (Negligent Hiring), and III (Broker Liability). The case was bifurcated into a liability phase and a damages phase. This memorandum concerns dispositive motions and pretrial evidentiary motions on liability.

Defendant Cowan Systems filed a statement of undisputed facts (ECF 132-2) and moved for summary judgment as to liability (ECF 132-3), and the Manion plaintiffs responded and filed

1

a cross-motion for partial summary judgment on the issue of violations of MAP-21 by the Cowan defendants (ECF 135). Plaintiff Carla Ortiz likewise responded to Cowan's motion for summary judgment, filing a response to Cowan's statement of undisputed material facts (ECF 139-1), her own counter-statement of undisputed material facts (ECF 139-2), an opposition to Cowan's motion (ECF 139-3), and a motion (ECF 139-4) renewing her earlier motion for partial summary judgment (ECF 58, denied at ECFs 116, 117). And plaintiff Cierra Rice-Wilder responded (ECF 140-2) to Cowan's motion by adopting Ortiz's and the Manion plaintiffs' arguments.

Cowan filed an omnibus reply (ECF 145) supporting its motion for summary judgment and responding to the plaintiffs' cross-motions for summary judgment, and Cowan also responded to the plaintiffs' counter-statements of undisputed material facts (ECF 145-1). The Manion plaintiffs (ECF 148) and Ortiz (ECF 151) replied in support of their cross-motions for summary judgment.

Two motions in limine are also pending. First, Cowan moved to exclude the testimony and opinions of the plaintiffs' broker liability experts (ECF 128). The Manion plaintiffs (ECF 134), Ortiz (ECF 136-1) and Rice-Wilder (ECF 137-2) opposed the motion, and Cowan replied in support of its motion (ECF 144). Shortly before oral argument, Ortiz filed a supplement (ECF 158) to her opposition.

Second, the Manion plaintiffs (ECF 129) and Ortiz (ECF 133-1) moved to exclude Cowan's expert witness Annette M. Sandberg. Cowan responded in opposition (ECF 138), and Ortiz (ECF 142-1) and the Manion plaintiffs (ECF 143) both replied in support of their motions.

2

Finally, the plaintiffs moved (ECF 141) to strike Cowan's amended answers to interrogatories and errata sheet (ECF 141-6, Ex. 4). Cowan responded (ECF 152), and the plaintiffs replied (ECF 153).

All these motions have been fully briefed, and the court heard oral argument on March 11, 2022.

## BACKGROUND

### The Collision

This tort action arises out of a June 18, 2018, traffic accident on northbound Interstate 95 in Harford County, Maryland. John Oliver Terry, Jr., was driving a tractor trailer for defendant Ben Strong Trucking. Starting about a mile before the crash site, signs warned of a construction zone due to several lane closures. (ECF 139-37, Nance Rep. at 34–35). Terry, however, said he had not seen the signs; he said he began to slow down when he saw brake lights in front of him. At one point, he believed he saw a car — Ortiz — cut in front of him, and he said he was not able to stop in time. The on-scene Maryland State Police crash report said all drivers involved except Terry had been stopped or were slowing to a stop before the collision. The plaintiffs' accident reconstructionist reported that Ortiz was slowing down from 16.2 miles per hours to 11.2 miles per hours at time of the impact, and the truck had decelerated to about 42 miles per hour. (ECF 139-37, Ex. 30, Nance Rep. at 38–39). According to the reconstructionist, Terry said during his deposition that he had been traveling at 55–60 miles per hour before applying his brakes, decelerating to 45 miles per hour at the time of impact. (*Id.* at 20).

Terry crashed into the back of plaintiff Carla Ortiz's Toyota Camry. The truck and Ortiz's car then traveled together as one combined unit, driving over to the left shoulder and striking the other plaintiffs' cars, including the Manions' Honda Civic, which was then

overturned on its roof in a ditch just past the edge of the road. The collisions resulted in physical injuries to the plaintiffs, including permanently debilitating injuries to Ortiz's daughter and the death of the Manion plaintiffs' child, M.M.

A post-accident North American Standard Commercial Motor Vehicle Level I Inspection determined that there was nothing mechanically wrong with the truck pre-collision that would have rendered the vehicle out of service under Federal Motor Carrier Safety Administration regulations. (ECF 132-32, Ex. 28, Peters Dep. at 25:3-7). Nor did the inspector identify any driver violations (e.g., lack of a valid license) that would have rendered Terry out of service as a driver. (*Id.* at 32–33). The on-scene investigator, however, listed the following contributing circumstances on the crash report: "Failed to give full time and attention, too fast for conditions, followed too closely, inattentive, disregarded other road markings, driver distracted[,] [i]nattentive[,] or lost in thought." (*Id.* at 33:9–34:8)

**Cowan's Corporate Structure**

Several Cowan entities are defendants in this case: Cowan Systems LLC ("Cowan Systems"), Cowan Systems Transportation LLC ("CST"), and Cowan Systems Inc. ("CSI"). Only Cowan Systems persists as an active business entity.

CSI is the oldest Cowan entity and is no longer active. It was incorporated in 1994 and received its carrier operating authority in 1994 and its broker operating authority in 1995. In May 2000, CSI ceased all operations and has not conducted any business activities since then. All of its assets (including its carrier and broker authorities) and employees were transferred to Cowan Systems, which was formed simultaneously to CSI's divestment.

CST (also known as Cowan Global Logistics) was a brokering operation created as a separate entity by Cowan Systems. It held broker operating authority under US DOT number

4

542448, although "Cowan Global Logistics" did not hold federal broker authority. While CSI still exists (albeit inactively since 2000), CST no longer exists. It began to wind down its activities after a leadership change in 2008, and it ceased all business with 2010 Articles of Cancellation as Cowan Systems was attempting to promote brokerage in its business. CST transferred its brokerage operations to Cowan Systems, but when the CST brokerage license went dormant in 2010, Cowan Systems already had a broker license due to the 2000 transfer from CSI.

Cowan Systems is registered with the federal transportation department as a motor property contract carrier, property broker, and motor property common carrier; the Federal Motor Carrier Safety Administration's SAFER website lists Cowan Systems' active USDOT number as 548880. The FMCSA issued Cowan Systems broker authority under license number MC 271882-B in May 2000. This broker authority has never been revoked by USDOT. Cowan Systems also uses the name "Cowan Logistics" as a trade name for its brokerage division; Cowan argues that when exercising its brokerage authority, Cowan Systems used the trade name but always referred to itself as well (e.g., COWAN LOGISTICS, a division of COWAN SYSTEMS, LLC). Cowan Systems' motor carrier operating authority license number is 271882-P. The parties dispute whether the broker and carrier operating authority license numbers are separate numbers. (ECF 145-1 ¶ 24).

**GAF and Cowan**

The load being carried the day of the accident was shipped by GAF Materials and intended for Harvey Building Products. No written agreement existed between GAF (the shipper) and Cowan. When GAF intended to assign a contract shipment to Cowan, GAF would enter the assignment and the rate for the shipment into its CarrierPoint system. The rates were

lane-specific; meaning they varied based on the destination rather than whether Cowan was brokering the load to another carrier or carrying the load with its own assets division.

When Cowan brokered a shipment to another carrier, Cowan would advise the carrier that it should sign in with its own carrier name at GAF upon arrival. Cowan would advise GAF that the carrier was there to pick up a load assigned to Cowan as a broker. The parties dispute whether the third-party carrier would provide its own name to GAF rather than just the order number and Cowan's name; Cowan says the third-party carrier would provide its own name and Cowan's name as the entity assigned through CarrierPoint, but the plaintiffs say the third-party carrier would tell GAF that it was not a Cowan truck only after the driver loaded the truck and was proceeding out of GAF's facility. (ECF 139-1, Pl. Resp. to Def. Statement of Undisputed Material Facts, at ¶ 44).

Once the truck was loaded, the bill of lading and packing slip would be completed. The bill of lading was auto-generated and printed by GAF for GAF and the driver to sign, after which the load has been officially released. The plaintiffs dispute that when the driver signs the bill of lading, he signs as the "motor carrier" as defined by federal law. (*Id.* ¶ 46). They also deny that when GAF signs the bill of lading, GAF knows the name of the "motor carrier" and instead knows only the name of the "carrier," which is "any person or corporation in possession of the property under the contract." (*Id.* ¶ 48).

GAF and Cowan had agreed that if Cowan had equipment available, it would use its own trucks to deliver GAF's shipment, but if no Cowan trucks were available, it would use another motor carrier to move the load. GAF did not require Cowan to identify in advance whether it was going to broker the load to another carrier or assign the load to its own assets division, but it preferred and expected Cowan assets where possible. According to Frank Longo, the GAF

employee who was Cowan's principal point of contact, "The agreement that I had with Chris was that he would do everything in his power to get Cowan trucks under our orders and if there were occasions, in this particular instance it looks like they were pretty much struggling, they would broker the loads out, yes." (ECF 132-24, Ex. 20, Longo Dep., at 17:18–18:2).

For GAF loads sent to Cowan in 2018, less than 5% were carried by Cowan's assets division, with the vast majority of the bills of lading bearing the signatures of carriers other than Cowan. (ECF 139-1, Pl. Resp. to Def. Statement of Undisputed Material Facts, at ¶ 50). As Longo testified, "I mean, we, again, we preferred to have the Cowan trucks, that was the ultimate goal, but they were under — from my understanding, they were brokering, yes." (ECF 132-24, Ex. 20, Longo Dep., at 18:3-11). There was no written contract between GAF and Cowan for the shipment in question, and Cowan Systems' corporate designee testified that he had seen no email saying Cowan Systems would be brokering the shipment.

**This Load and Driver John Oliver Terry, Jr.**

GAF advised Cowan on June 8, 2018, that it had assigned Cowan the load in question. The shipment was to be picked up from GAF in Baltimore on June 15, 2018, and delivered in Massachusetts by June 18, 2018. Ben Strong Trucking accepted the shipment on June 15; Benjamin Wherry of BST signed the bill of lading. Cowan says BST accepted the shipment as the "motor carrier," whereas the plaintiffs say Cowan was the "motor carrier" and BST was merely the "carrier." (ECF 139-1, Pl. Resp. to Def. Statement of Undisputed Material Facts, at ¶ 54). The packing slip identified CSI (by then long defunct) as the motor carrier; the plaintiffs say this referred to Cowan Systems.

GAF employee John Biggs countersigned the bill of lading, and Wherry left, driving first to North Carolina (due to unrelated business financial concerns), and later deciding to have co-

defendant John Oliver Terry, Jr., take the shipment to Massachusetts. BST had hired Terry

sometime after Wherry had picked up the load and before the day of the accident; there is no

evidence that Wherry had told Cowan or GAF that Terry would be driving. Terry was driving on

June 18 when the collision occurred.

Terry was a fully licensed commercial motor vehicle operator who had never been

involved in a commercial motor vehicle accident before this case and whose driving record did

not reveal any license withdrawals or relevant convictions (ECF 132-30, Ex. 26, Terry Dep. at

30:15–19; ECF 139-20, Ex. 14, Terry Driving Record); he passed his pre-employment drug and

alcohol tests for BST. Cowan had not hired, trained, instructed, or directly paid Terry (who,

again, had not been the subject of any communications from Wherry), though the plaintiffs say

Cowan would have had the right to have Terry removed from the shipment. (ECF 139-8, Ex. 2,

Allen Tr. Vol. I at 276:21–277:10).

**Cowan's Vetting of BST**

At the time of the accident, BST was registered as a carrier, and its authority had never

been revoked, suspended, or limited by USDOT, nor had it ever been placed on a conditional or

probationary status.

Cowan's vetting policy is at issue in this case. (*See* ECF 132-14, Ex. 10, Cowan Vetting

Policy). When selecting a motor carrier to haul a load, Cowan Systems used a first-come, first-

served model, choosing the first carrier that met its qualifications. No federal law codifies any

standard a broker must use when selecting a motor carrier; Cowan created its own vetting

process. Cowan would ensure the carrier had a valid USDOT number and valid FMCSA-issued

operating authority. Cowan required the carrier to have held its authority for at least 6 months.

Cowan would ensure the carrier was either "unrated" or had a "satisfactory" rating from the

8

FMCSA. Approximately 90% of motor carriers are not rated, so unrated carriers are common. Additionally, Cowan would obtain an insurance certificate from the carrier ensuring at least one million dollars of auto liability. Cowan required motor carriers to enter into a broker-carrier agreement; BST executed its agreement on May 15, 2018. The agreement states that "[i]t is understood and agreed that the relationship between BROKER and CARRIER is that of independent contractor." (ECF 132-18, Ex. 14, Broker-Carrier Agreement § 4(A)).

The parties agree that this vetting process existed, and that BST satisfied all those criteria, though the plaintiffs still dispute whether Cowan used that vetting process in selecting BST (ECF 139-1, Pl. Resp. to Def. Statement of Undisputed Material Facts, at ¶ 15). Notably, Cowan's policy included reviewing carrier data published by the FMCSA's data aggregating service, Carrier 411. Cowan offers a Carrier 411 Due Diligence Certificate as evidence that Cowan had looked up BST on Carrier 411, though the plaintiffs point to the lack of documentation containing substantive information about BST. (*See* ECF 139-1, Pl. Resp. to Def. Statement of Undisputed Material Facts, at ¶ 23; ECF 132-23, Ex. 19, Carrier 411 Due Diligence Certificate).

BST had also passed its FMCSA new Entrant safety audit at the time, although the plaintiffs dispute the audit's relevance, as they say Cowan did not have any record of the audit in its possession at the time and therefore could not have relied on it in vetting BST. (ECF 139-1, Pl. Resp. to Def. Statement of Undisputed Material Facts, at ¶ 20). Before the accident, Cowan had brokered just one shipment with BST in May 2018, which BST completed without incident; Cowan's vetting of BST took place before that initial load. BST had never been involved in a motor vehicle accident. A SAFER snapshot of Ben Strong Trucking from September 2018 (three months after the collision) shows that BST had no safety rating and had an out-of-service vehicle rate of 40% (national average 20.72%) and an out-of-service driver rate of 13.3% (national

9

average 4.50%). (ECF 139-14, Ex. 8, SAFER Snapshot; ECF 145-1, at ¶ 48 (disputing the

relevance of the snapshot, as it post-dated the collision and the selection of BST)). Cowan asserts

in its briefing that from the time BST was registered up until April 2018 (the final month that

Cowan would have seen in its May 2018 vetting of BST), BST had undergone ten inspections,

only one of which resulted in an out-of-service violation for a driver — a 10% rate based on a

single hours-of-service violation. (ECF 132-3 at 29-30). Cowan provides no citation for this

assertion; the plaintiffs do not appear to address it explicitly.

Those "out of service" rates refer to FMCSA-mandated periodic roadside inspections

conducted within the past two years. SAFER Help, https://safer.fmcsa.dot.gov/saferhelp.asp

x#Inspections (last accessed Aug. 25, 2022). A vehicle is placed out of service and not

authorized to operate "when, upon inspection, defects on the vehicle are located that are so

severe that the vehicle can no longer legally operate on public roadways." (ECF 128-15, Ex. 11,

Allen Report, at 7). Drivers are placed out of service "when there are violations that are so

unsafe that the driver is no longer allowed to operate commercial motor vehicles." (*Id.*).

Examples of roadside inspection violations include unsafe driving, hours-of-service compliance,

driver fitness, drugs/alcohol, vehicle maintenance, hazardous materials compliance, and histories

or patterns of high crash involvement. *See* Roadside Inspection Program: What Inspectors Need

to Know, at 2, https://csa.fmcsa.dot.gov/Documents/roadside_factsheet.pdf (last accessed Aug.

11, 2022).

## LEGAL STANDARD

### Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is

genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party

of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*,

673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit

under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477

U.S. at 247–48.  The court must view the evidence in the light most favorable to the nonmoving

party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable

inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see

also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the

same time, the court must "prevent factually unsupported claims and defenses from proceeding

to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting

*Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

**Expert Witnesses**

Rule 702 of the Federal Rules of Evidence, which "was intended to liberalize the

introduction of relevant expert evidence," *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261

(4th Cir. 1999), provides that a qualified expert witness "may testify in the form of an opinion or

otherwise if . . . [his or her] scientific, technical, or other specialized knowledge will help the

trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The

expert's testimony must be "based on sufficient facts or data" and must be "the product of

reliable principles and methods." Fed. R. Evid. 702(b), (c). And the expert must "reliably appl[y]

the principles and methods to the facts of the case." Fed. R. Evid. 702(d).

11

It is the district judge's responsibility to make an initial determination of an expert's qualifications, *see* Fed. R. Evid. 104(a), and to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). Relevant evidence is that which "helps the trier of fact to understand the evidence or determine a fact in issue." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 959 (4th Cir. 2020) (internal quotation marks and citation omitted). Reliable expert testimony is "based on scientific, technical, or other specialized knowledge and not on belief or speculation" and derives any inferences "using scientific or other valid methods." *Id.* (internal quotation marks omitted). The Supreme Court has identified five factors that the court may consider in evaluating the reliability of an expert's reasoning or methodology: (1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the method; and (5) whether the technique has gained general acceptance in the relevant scientific community. *See Daubert*, 509 U.S. at 593–94. These factors, which "may or may not be pertinent in assessing reliability," are not meant to be "definitive" or to constitute a "checklist." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150, 151 (1999) (internal quotation marks omitted).

"As in all questions of admissibility," the party seeking the admission of expert testimony "must come forward with evidence from which the court can determine that the proffered testimony is properly admissible" — i.e., that it is reliable and relevant. *Md. Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998). A district court must take seriously its responsibility to ensure "that a proffered expert opinion is 'sufficiently relevant and reliable when it is submitted to the jury.'" *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir.

12

2021) (quoting *Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017). Yet the trial court's

role as a gatekeeper is not intended to serve as a "replacement for the adversary system, and

consequently, the rejection of expert testimony is the exception rather than the rule." *In re*

*Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig.*, 892 F.3d 624, 631

(4th Cir. 2018) (internal quotation marks and citation omitted).

## ANALYSIS

### I. <u>Summary Judgment</u>

#### A. **Cowan was a broker**

At the core of the cross motions for summary judgment is a dispute over whether Cowan

ought to be treated as a broker or as a motor carrier. The plaintiffs argue that Cowan was a motor

carrier that hired Ben Strong Trucking as its independent contractor, and they urge a strict

reading of relevant federal statutes and regulations. In contrast, Cowan argues that it was acting

as a broker, not a motor carrier, and it brokered out GAF's load to motor carrier Ben Strong

Trucking. Cowan points to caselaw outlining several other factors to consider in making the

determination.

##### *1. Dual Authorities*

Under federal law, a person may only provide transportation as a motor carrier or

services as a broker (subject to 49 U.S.C. § 13501) if that person is registered to provide such

transportation or services. 49 U.S.C. § 13901(a). The 2012 Moving Ahead for Progress in the

21st Century Act ("MAP-21") introduced two measures relevant to this case. First, it required

that "[i]f the Secretary [of the FMCSA] registers a person under this chapter to provide

[transportation or services as a motor carrier or broker], the Secretary *shall issue a distinctive*

*registration number to the person for each such authority* to provide transportation or service for

which the person is registered." 49 U.S.C. § 13901(b)(1) (requiring separate registration numbers for services as a broker and as a motor carrier) (emphasis added). Second, it required that "[f]or each agreement to provide transportation or service for which registration is required under this chapter, the registrant shall *specify, in writing, the authority under which the person is providing such transportation or service.*" 49 U.S.C. § 13901(c) (emphasis added). A defendant may be either a motor carrier or a broker, but it cannot be both in the same transaction. *Ripley v. Long Distance Relocation Services, LLC*, Civil No. CCB-19-373, 2019 WL 5538343, at *5 n.8 (D. Md. Oct. 25, 2019). "[T]here is no overlap in the statute between 'carriers' and 'brokers[.]'" *5K Logistics, Inc. v. Daily Exp., Inc.*, 659 F.3d 331, 335 (4th Cir. 2011).

Cowan Systems, LLC's USDOT transportation number and FMCSA-issued broker and carrier license numbers both predated MAP-21; Cowan received its carrier authority in 1994 and its broker authority in 1995 as CSI and transferred those authorities to Cowan Systems in 2000 when CSI ceased business operations. (ECF 132-2 ¶¶ 1–5). There is no genuine dispute that Cowan had obtained both carrier and broker operating authorities that had not been revoked at any time prior to the events of this case.[1]

### 2. *How Cowan Held Itself Out*

Generally, a "broker" is a person that sells, or holds itself out as selling, transportation by motor carrier for compensation. *See* 49 U.S.C. § 13102(2).[2] When determining whether an entity

---

[1] In 2013, the FMCSA sent a notice to every motor carrier telling them that if they did not have brokerage authority, they would need to obtain it (as well as the increased $75,000 bond required) but sent no such communication to people with dual authorities saying they had to re-register or give up one of their authorities because they were not permitted to have both at the same time. (ECF 134-1, Merches Dep at 148:19–149:19).

[2] The full definition provides that: "The term 'broker' means a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." *See* 49 U.S.C. § 13102(2). *See also* 49 C.F.R. § 371.2(a) ("Broker means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this

14

is a broker or a carrier, courts consider how an entity holds itself out to the world as well as the entity's relationship to the shipper. *See, e.g., Schramm v. Foster*, 341 F. Supp. 2d 536, 548 (D. Md. 2004).[3] Notably, the *Schramm* case predates MAP-21, and its applicability is a subject of great disagreement between the parties. The Fourth Circuit has not yet weighed in on this kind of analysis. But in the similar context of Carmack Amendment[4] cases related to property loss due to damaged freight, the Third Circuit affirmed a district court's post-MAP-21 observation that courts consider various factors to determine whether a party is, in fact, a motor carrier or a broker, including:

> (1) whether the entity promised to personally perform the transport and therefore legally bound itself to transport;
>
> (2) the type of services the entity offers;
>
> (3) whether the entity held itself out to the public as the actual transporter of goods; and
>
> (4) whether the entity's only role was to secure a third party to ship plaintiff's goods.

*Tryg Ins. v. C.H. Robinson Worldwide, Inc.*, Civil Action No. 15–5343, 2017 WL 5725057, at *6–7 (D.N.J. Nov. 28, 2017) *aff'd*, 767 Fed. App'x 284 (3rd Cir. Apr. 19, 2019) (finding the defendant held itself out as a carrier because it "represented itself as an entity that provided a 'seamless service,' without any indication of the involvement of third-parties" and, in the

---

section when they [i] arrange or offer to arrange the transportation of shipments [ii] which they are authorized to transport and [iii] which they have accepted and legally bound themselves to transport").

[3] The term "motor carrier" means a person providing motor vehicle transportation for compensation. 49 U.S.C. § 13102(14).

[4] The Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706, "creates a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading." *5K Logistics, Inc.*, 659 F.3d at 335 (citation and internal quotation marks omitted). The Carmack Amendment's language makes clear that it does not apply to brokers, so Carmack Amendment cases often involve hinge on the analysis of whether one of the parties was a broker or a carrier. *See, e.g., TRG Holdings, LLC v. Leckner*, No. 1:06-cv-411-JCC, 2006 WL 2076768 at *1–2 (E.D. Va. July 20, 2006).

shipper's understanding based on the defendant's course of dealing with the shipper, had taken

responsibility for the goods and arranged for their transportation).[5] The Eleventh Circuit,

meanwhile, points to the common law of bailment as a useful analogue: when a party (or bailee)

holds itself out as the party responsible for the care and delivery of another's (the bailor's)

property, it cannot abrogate its contractual responsibility by outsourcing to a sub-bailee the care

and delivery it agreed to provide. *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d

1292, 1301 (11th Cir. 2018). The *Essex* court continued:

> Even a company like [the defendant], which carries some shipments and brokers
> others, can insulate itself from strict liability with respect to a particular shipment if
> it makes clear in writing that it is merely acting as a go-between to connect the
> shipper with a suitable third-party carrier. Where no such writing exists, the question
> will depend on how the party held itself out to the world, the nature of the party's
> communications and prior dealings with the shipper, and the parties' understanding
> as to who would assume responsibility for the delivery of the shipment in question.
> In any case, the operative inquiry is this: pursuant to the parties' agreement, with
> whom did the shipper entrust the cargo?

*Essex*, 885 F.3d at 1301–02 (proceeding to reverse the lower court's summary judgment finding

that the defendant had been a carrier, because a genuine dispute of material fact existed as to

whether the defendant had been trying to act as a broker).

Here, no genuine dispute of material fact exists that Cowan held itself out as a broker.

First, GAF understood Cowan's authority to be that of a broker, even if GAF hoped that its load

might be brokered to one of Cowan's own trucks. The record does not suggest that GAF

"believed [Cowan] was accepting responsibility to ship the load itself pursuant to its motor

carrier authority." *See Schramm*, 341 F. Supp. 2d at 549. Indeed, both GAF and Cowan seemed

to understand that moving the shipment with Cowan assets was a low-probability outcome —

even if preferable to GAF — compared to Cowan finding a motor carrier to take the shipment.

---

[5] Unpublished opinions are cited for the persuasiveness of their reasoning, not for any precedential value.

GAF knew of the third-party carriers likely to move its shipment. *Cf. Tryg*, 2017 WL 5725057, at

*6. Indeed, the shipper employee responsible for the transaction repeatedly admitted he

understood Cowan to be acting as a broker. "None of [the plaintiffs'] arguments are viable in

light of [Longo's] deposition testimony. Even if [Cowan's] advertisements suggest that they

have the capacity to act as both a carrier and a broker, [Longo] was clear that in this case

[Cowan] was merely acting as a broker." *Active Media Services, Inc. v. CAC American Cargo

Corp.*, 2012 WL 4462031, at *4 (S.D.N.Y. Sep. 26, 2012) (evaluating broker status vs. carrier

status in a non-personal-injury context).

Second, the fact that Cowan had both broker and carrier authority (albeit under the same

USDOT and FMCSA numbers) is irrelevant to this transaction. A transportation entity may have

authority to operate as both a broker and a carrier. *Schramm*, 341 F. Supp. 2d at 549 (finding pre-

MAP-21 that the proper inquiry was whether a dual-authority entity had acted as a broker or

carrier in the specific transaction at issue); *see also Active Media Services, Inc.*, 2012 WL

4462031, at *4; *Chubb Group of Ins. Companies v. H.A. Transp. Systems, Inc.*, 243 F. Supp. 2d

1064, 1069–70 (C.D. Cal. 2002). The plaintiffs' rigid textualism is unavailing.

Third, the identification of Cowan as the "carrier" on the bill of lading does not prove

that Cowan was in fact this transaction's carrier and had merely contracted (rather than brokered)

the shipment to BST. An erroneous bill of lading prepared by a third party, which identified the

defendant as the "carrier" of the load, could not establish the defendant's carrier status since the

defendant played no role in its preparation. *See Schramm*, 341 F. Supp. 2d at 549 (citing *Chubb*,

243 F. Supp. 2d at 1070). This bill of lading was drafted by GAF (ECF 132-2 ¶ 46), auto-

generated and then printed for GAF and the driver to sign. There was no evidence that Cowan

saw the bill of lading before it was handed to BST to sign. It is common for shippers to insert the

17

broker's name if the carrier is unknown at the time the load is arranged. Most importantly, before GAF released the shipment, GAF knew who the carrier was; the shipper required the driver to write on the bill of lading the name of the carrier accepting the load and his name as the driver.

Fourth, Cowan provided BST with information about pickup and delivery timing and location (consistent with its role as a broker) but did not assume control of BST or its drivers. GAF controlled the route, a fact made apparent through Wherry's initial travel in the opposite direction from the shipment's eventual destination and his replacement with a driver unknown to Cowan.

The plaintiffs attempt (ECF 139-3 at 14) to distinguish *Schramm* in that the *Schramm* broker-defendant did not own any of its transportation equipment. *See Schramm*, 341 F. Supp. 2d at 541. But this fact was not dispositive for the *Schramm* court, which proceeded to analyze in depth the transportation entity's status as a broker rather than a carrier. *Id.* at 548–50. And other courts have found entities still acted as carriers with only a broker's license and no carrier's license; ownership or non-ownership of actual rolling stock is not dispositive. *See, e.g., Tryg Insurance*, 2017 WL 5725057, at *2 ¶ 8.

### 3.  Acceptance

The plaintiffs also argue that Cowan was a carrier based on the relevant regulations' definition of a broker. There is no genuine dispute that Cowan [i] offered to arrange the transportation of the shipment and [ii] was authorized to transport the shipment, based on GAF's understanding that Cowan would broker out the shipment or (as was preferred by GAF but occurred for less than 5% of Cowan's loads) ship it using Cowan trucks. *See* 49 C.F.R. § 371.2(a). The question is whether Cowan [iii] "accepted and legally bound" itself to transport the shipment, making it a motor carrier under FMCSA regulations.

The plaintiffs say that Cowan accepted the shipment from GAF on June 8, 2018, legally binding itself at that point to transport it. Then, they say, Cowan contracted on June 15 (the pickup day) to use BST to deliver the load, making Cowan the carrier and BST its contractor. Cowan disagrees, arguing that June 8 was the day Cowan agreed to broker transportation for the shipment; on June 15, BST accepted tender and legally bound itself as the carrier when it loaded the shipment onto its truck and signed the bill of lading. Combined with GAF's understanding that Cowan was an intermediary (albeit one capable of moving shipments itself in a small percentage of cases and in certain lanes), Cowan did not on June 8 accept responsibility, and legally bind itself, to complete the shipment; to accept this theory would transform any broker into a carrier the day it agreed to broker a shipment.

The plaintiffs argue (ECF 139-3 at 14–15) that Cowan solicited the GAF load for its own account as a motor carrier, because GAF understood that Cowan would function as the carrier if possible. But this preference for a Cowan truck was not a requirement and does not undermine GAF's view of Cowan as an intermediary. There is no evidence that Cowan conveyed to GAF that it would be transporting the load itself or that it engaged in anything other than "selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2).

### 4. MAP-21 Compliance Questions

The plaintiffs argue (ECF 135) that Cowan was not registered as a broker at the time of the accident, and therefore the plaintiffs have a private right of action established by 49 U.S.C. § 14916(a) and (c). "A person may provide interstate brokerage services as a broker only if that person . . . is registered under, and in compliance with, section 13904 . . .." 49 U.S.C. § 14916(a). Any person who directly or indirectly violates that provision "is liable . . . to the

injured party for all valid claims incurred without regard to amount." *Id.* § 14916(c)(2). The plaintiffs' theory is that Cowan failed post-MAP-21 to obtain distinct license numbers for its pre-MAP-21 broker and carrier authorities; its brokerage of GAF's shipment therefore violated § 14916(a) and opened the door to common-law negligence suits for damages under § 14916(c)(2).

But even if MAP-21 did open that door, it does not create vicarious liability where none otherwise existed. A broker is not vicariously liable for the negligence of its motor carrier's driver "unless [the broker] had control over [the driver's] driving time and the condition in which he drove[.]" *Schramm*, 341 F. Supp. 2d at 546. Cowan exerted no such control over BST, Wherry, or Terry. The court need not address any further 49 U.S.C. § 14916's private cause of action, because any state common law claims (e.g., negligence) authorized against Cowan under that provision would fail because vicarious liability would not attach.

### 5.  *Conclusion*

In the March 2021 memorandum on Ortiz's initial motion for summary judgment (ECF 116; Order at ECF 117), the court noted the continuing genuine disputes of material fact as to the status of Cowan's brokerage license and the extent to which Cowan identified itself as the broker. Those disputes of fact have been resolved. Cowan had a brokerage license dating back to 1995; it held itself out to GAF, and was understood by GAF, to be a broker; and any failure to re-register its brokerage operation and obtain a separate post-MAP-21 broker number would not change the fate of its common-law negligence claims, which fail for lack of vicarious liability.

### B.  **Even if the plaintiffs' claims of broker liability for negligent hiring not preempted by the FAAAA, the safety exception saves the claim.**

Cowan contends that the Federal Aviation Administration Authorization Act (FAAAA) preempts the plaintiffs' negligent hiring claim. Under that law, states "may not enact or enforce a

law, regulation, or other provision having the force and effect of law related to a price, route, or service of any . . . broker . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). Cowan argues that state common-law negligent hiring claims end up regulating brokers' prices, routes, and services in contravention of the FAAAA.

Other district courts in the Fourth Circuit have found common-law negligent selection claims not to be preempted under the FAAAA. *See Mann v. C. H. Robinson Worldwide, Inc.*, No. 7:16-cv-102, 2017 WL 3191516, at *5–*8 (W.D. Va. July 27, 2017); *Gilley v. C.H. Robinson Worldwide, Inc.*, No. 1:18-536, 2019 WL 1410902, at *3–*5 (S.D.W. Va. Mar. 28, 2019); *Vitek v. Freightquote.com, Inc.*, No. JKB-20-274, 2020 WL 1986427, at *2–*4 (D. Md. Apr. 27, 2020). "A negligent hiring claim as an avenue for imposing liability for an accident does not have anything more than a tenuous, remote, or peripheral connection to the price, route, or service of a broker. . .. Instead, . . . a personal injury suit for negligent hiring is not an attempt to regulate the services of a freight broker." *Mann*, 2017 WL 3191516, at *7 (internal citations and quotations omitted). As the *Mann* court described, a state common law negligent hiring claim is a general law aimed at everyone in the state rather than a direct regulation of brokers. *Id.* at *7. This negligent hiring claim reflects "an attempt by members of the driving public to recover for a broker's alleged negligence in selecting an unsafe motor carrier. This does not have more than a remote connection to a broker's services and does not have a significant impact related to Congress' deregulatory and pre-emption-related objectives." *Id.* at *7 (internal quotations omitted); *see also Gilley*, 2019 WL 1410902, at *5. In other words, a "generally applicable background regulation in an area of traditional state power that has no significant impact on[] prices, routes, or services" will not be preempted. *Vitek*, 2020 WL 1986427, at *3 (quoting *California Trucking Ass'n v. Su*, 903 F.3d 953, 961 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1331

21

(2019)) (discussing negligence rather than negligent hiring FAAAA preemption outside the personal injury context).

The *Vitek* court did point to the possibility that "[i]n the negligent hiring context [as opposed to pure negligence], defendants can credibly argue that the imposition of liability risks a pseudo-regulatory effect by reshaping the level of service a broker must provide in selecting a motor carrier." *Vitek*, 2020 WL 1986427, at *4 (citing *Miller v. C.H. Robinson Worldwide, Inc.*, No. MMD-WGC-317-408, 2018 WL 59819840, at *4 (D. Nev. Nov. 14, 2018)). In the only federal Circuit Court case to address the question,[6] the Ninth Circuit found that a negligent hiring claim against a broker was "related to" that broker's services sufficiently to trigger FAAAA preemption. *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1020 (9th Cir. 2020), *cert. denied*, ___ S. Ct. ___, 2022 WL 2295168 (June 27, 2022).[7] The court considered two key features of the generally applicable common law claim: where in the chain of the defendant's business the law acted to compel a certain result (e.g., consumer or workforce) and what result it is compelling (e.g., a certain wage, non-discrimination, a specific system of delivery). *Miller*, 976 F.3d at 1024 (citing *Su*, 903 F.3d at 966). The *Miller* court found that selection of motor carriers is one of the core services of brokers, meaning the negligent hiring claim interferes not in the background of the business but rather at the point at which the broker arranges for transportation, where it is directly connected with broker services. *Id.* at 1025.

---

[6] Several federal circuit courts have found that the parallel Airline Deregulation Act of 1978 (ADA) clause, from which the FAAAA language is copied, does not preempt negligence actions. *See Vitek*, 2020 WL 1986427 at *3 (collecting cases).

[7] *But see R.J. Reynolds Tobacco Company v. County of Los Angeles*, 29 F.4th 542, 553 n.6 (9th Cir. 2022) (criticizing *Miller* for insufficiently addressing Supreme Court precedent holding that if a statute contains an express pre-emption clause, there is no presumption against pre-emption; instead, courts should focus on the plain wording of the clause to discern Congress's pre-emptive intent). *R.J. Reynolds* predated the Supreme Court's denial of certiorari in *Miller*.

But the *Miller* court found that a negligent hiring claim fell within the FAAAA's safety

exception: even if the state negligent hiring claim affected brokers' prices, routes, or services

enough to trigger preemption under § 14501(b)(1), the general "safety regulatory" exception of

paragraph (c)(2)(A) would apply to save the claim. *Miller*, 976 F.3d at 1025–26 (applying

49 U.S.C. § 14501(c)(2)(A)); *see also Mann*, 2017 WL 3191516, at *8. First, the "safety

regulatory authority" of a state encompasses common-law tort claims. *Miller*, 976 F.3d at 1026–

29. Second, negligence claims that stem from motor vehicle accidents are "with respect to motor

vehicles" as contemplated by the saving clause, even where the defendant-broker did not own the

vehicle or select the specific driver who caused the accident. *Id.* at 1030–31. The court will not

limit "valid safety rationales" "to those concerned only with the safe physical operation" of

motor vehicles but will understand the exception to reach regulations that are "genuinely

responsive to the safety of other vehicles and individuals." *Id.* at 1030 (internal quotations and

citation omitted).

Even assuming, then, that a negligent hiring claim's effect on broker services is

significant enough to be covered by § 14501(c)(1), the paragraph (c)(2)(A) safety regulatory

exception applies to save the claim. Count III is not preempted.

### C. There remains a genuine dispute of material fact as to whether Cowan was negligent in hiring Ben Strong Trucking.

The Court of Appeals of Maryland in *Perry v. Asphalt & Concrete Services, Inc.*, laid out

the elements of a negligent hiring claim:

> For a cause of action based in negligence, such as negligent hiring, a plaintiff must
> prove the existence of a duty owed by a defendant to him (or to a class of which he is
> a part), a breach of that duty, a legally cognizable causal relationship between breach
> of duty and the harm suffered, and damages. One is negligent if he or she breaches a
> duty he or she owes to another. That negligence is actionable, however, only if it is a

23

proximate cause of the damage. Specifically, to establish liability[8] in a negligent
hiring claim, the plaintiff must prove two links in the causal chain. First, the plaintiff
must show that the failure of an employer to undertake a reasonable inquiry resulted
in the contractor's hiring. Next, even if a negligent hiring is shown, the plaintiff still
must prove that the hiring was a proximate cause of the plaintiff's injury.

133 A.3d 1143, 1155 (Md. 2016) (cleaned up) (citing *Cramer v. Housing Opportunities Comm'n of Montgomery Cty.*, 501 A.2d 35, 39 (Md. 1985)).

Although Cowan had no role in hiring Terry and there is no evidence that Cowan knew of Terry's role or controlled his route or actions, there remain disputed facts that prevent summary judgment for Cowan. The focus of Cowan's argument for summary judgment is the allegedly weak evidence that BST was incompetent and that this alleged incompetence was a proximate cause of the plaintiffs' injuries. The plaintiffs' notion of causation, according to Cowan, is too broad: evidence of incompetence unrelated to the causes of the accident cannot show that the alleged negligent hiring was a proximate cause of the collision. In other words, the alleged negligent hiring of Ben Strong Trucking must be connected to the circumstances of the accident more tightly than the mere assertion that the accident would not have happened but for BST's hiring.

The two primary facts in play are BST's driver out-of-service percentages (one violation over ten inspections up until April 2018, and two violations over fifteen inspections as of September 2018) and vehicle out-of-service percentages (data unknown through only April 2018; four violations out of ten inspections as of September 2018). Though Cowan challenges the relevance[9] of figures that go beyond April 2018 (the final month that Cowan would have considered when brokering the load to BST), even the April 2018 10% driver out-of-service

---

[8] The plaintiffs contend that discussion of causation is inappropriate at this stage of the litigation because the matter has been bifurcated into a liability stage and a damages stage. But, as indicated in *Perry*, Maryland courts generally include causation showings as an element of liability.

[9] The plaintiffs counter that BST ceased operations after the accident.

rating exceeds the national average of 5.51%, and the September 2018 40% vehicle out-of-service rating exceeds the national average of 20.72%. (ECF 139-35, Ex. 29a, Allen Expert Report at 7). Admittedly, the record does not suggest that Terry had an hours violation like BST's one driver violation leading up to April 2018, but the plaintiffs' expert Bussard asserts that, because BST was a new and unreliable carrier, elevated out-of-service rates should have spurred additional inquiries, that would have led to BST's exclusion. (*See* ECF 128-8, Ex. 6, at 8–11).

The plaintiffs have also raised the issue of the truck's speed and potential malfunctioning of the truck's governor. Their accident reconstructionist expert witness says Terry failed to adequately control the speed of his truck — in order words, that speeding was a primary cause of the collision. (ECF 139-37, Ex. 30, Nance Expert Report at 43–44). They have also presented evidence that the truck was at some point (though not during the accident) cruising at 78 miles per hour despite a governor set at 75 miles per hour. (ECF 139-8, Ex. 2, Allen Dep. at 170 of 221, Vol. II, page 107). The causal connection between a potentially malfunctioning governor and this particular collision is weak, given that Terry slowed down from 55 or 60 miles per hour to about 45 miles per hour at impact — all speeds below the governor's setting. But the plaintiffs might also use the potentially faulty governor and cruise control setting as circumstantial evidence supporting the idea that Ben Strong Trucking had a history of excessive speed. While Terry's inattentiveness may have been the main cause of the collision, a reasonable jury still could find that Cowan negligently selected a carrier with higher-than-average vehicle malfunction rates tied to speed where the collision was caused in part by a truck with a malfunctioning speed governor traveling at an excessive speed.

## II. Motions in Limine

## A. Cowan's Motions

Cowan moved to exclude the plaintiffs' experts, Clayton Merches, Timothy Bussard, and Roger Allen (ECF 128-1, Mot. to Exclude; Pl. Opp'ns at ECFs 134 (Merches), 136-1 (Allen), and 137-2 (Bussard); Cowan's Reply at ECF 144; Pl. Suppl. at ECF 158). Merches, Allen, and Sandberg all offer opinions relating to the application of MAP-21 to Cowan; because Cowan was a broker as a matter of law (*see* § I.A, *supra*), all such expert witness testimony will be excluded as legal conclusions that are unhelpful to the trier of fact. Allen, Bussard, and Sandberg also offer opinions on the standard of care when vetting motor carriers. In summary, it appears there is no single national standard of care. All these witnesses' testimony is based on their experiences in the industry and on reliable methodologies that involve assessing a carrier's licensure, operating authority, insurance coverage, and safety data. Their vetting-related testimony will be helpful to the jury and will therefore be admitted.

### 1.  Clayton Merches

The Manion plaintiffs offer Clayton Merches to testify as an expert witness regarding Cowan's MAP-21 compliance. (*See* ECF 128-4, Ex. 2, Merches Report at 13–14). Those opinions are:

1.  Cowan Systems, LLC failed to separately register Cowan Logistics as required in MAP-21 and 49 U.S.C. § 13902(6).
2.  Cowan Logistics failed to register as a broker under 49 U.S.C. § 13904.
3.  Cowan Logistics failed to file the OP-1 Form as required by the Federal Motor Carrier Safety Regulations.
4.  Cowan Logistics failed to file the MCS-150 Form as required by the Federal Motor Carrier Safety Regulations.
5.  Cowan Systems, LLC violated 49 C.F.R. 371.7 – Misrepresentation.
6.  Cowan Systems LLC is liable for private causes under 49 U.S.C. § 14916 for failing to register its brokerage entity in accordance with 49 U.S.C. § 13904 and conducting unauthorized brokering activities having operated as a broker and a motor carrier without separating each entity.

26

(*See* ECF 128-4, Ex. 2, Merches Report at 13–14).

Although Merches can point to no brokerage-specific trainings or accreditations (ECF 128-5, Ex. 3, Merches Dep. at 28:6–29:1), the Manion plaintiffs argue for his qualifications primarily based on his 22 years in the trucking industry as Safety Director and Vice President of Safety for several trucking companies (ECF 128-3, Ex. 1, Merches CV at 1), though never with those companies' brokerage divisions (ECF 128-5, Ex. 3, Merches Dep. at 22:20–23:15).

Experience alone, or in conjunction with "other knowledge, skill, training or education," can provide sufficient foundation for expert testimony. *See Kumho Tire Co.*, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience"). On the other hand, an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise. *See St. Michael's Media, Inc. v. Mayor and City Council of Baltimore*, 566 F. Supp. 3d 327, 355 (D. Md. 2021) (internal citation omitted).

The centerpiece of Merches's qualifications is his experience from 2011 through 2015 trucking company J&R Schugel, where he oversaw the process of separating its motor carrier and broker operations. (ECF 134-1, Merches Dep. at 84, 90:10-21). This was the one time in his career he has applied for brokerage authority. (*Id.* at 107:4-11). Merches's experience — especially at J&R Schugel — provides him a basis for the opinion that separating carrier and broker operations is feasible as well as how it can be accomplished; he has seen and facilitated the process. But this experience does not provide any basis for opinions on whether it must be done or even whether it is commonly done. (*See* ECF 134-1, Merches Dep. at 148:19–150:8 (describing J&R Schugel's decision to pursue separate authorities in response to 2013 post-MAP-21 FMCSA notices to carriers that they would need to obtain broker authorities, but

acknowledging no knowledge of any comparable FMCSA notices to dual-authority-holders that they would need to separate their authorities)).

As described above, expert witness opinions on the application of MAP-21 will be excluded as unhelpful legal conclusions given the court's ruling as to Cowan's carrier status. Merches's opinions will therefore be excluded except to rebut testimony, if any is admitted, claiming that re-registration with separate carrier and broker authorities was not feasible.

### 2. *Roger Allen*

The plaintiffs offer Roger Allen's expert witness testimony for two conclusions:

1. Cowan Systems failed to disclose under which authority it was operating to GAF in violation of 49 U.S.C. § 13901(c); and

2. Cowan Systems failed to properly vet BST prior to placing a shipment with them. (ECF 128-15, Ex. 11, Allen Report; ECF 128-16, Ex. 12, Suppl. Rep.).

As discussed above, Allen's opinion regarding MAP-21 compliance will be excluded as unhelpful to the jury.

What remains is his opinion on Cowan's vetting of BST. Allen said that while there are no fixed cutoffs and rules about when to disqualify a carrier, there is an "industry standard" that Cowan followed, performing its vetting policy but not going far enough. (ECF 128-18-22, Allen Dep. at 160:19–161:6 (Cowan had the industry standard), 258:18–259:6). He opined that "when [the out of service score] is above the national average, that's a red flag," made doubly alarming "if it goes over by a big amount." (*Id.* at 237:13–238:8). He eventually specified a 30 percent out-of-service rating as the cutoff. (*Id.* at 239:11-16).

Allen's CV reveals extensive experience in the industry, and several other courts have found him qualified to serve as an expert. *See, e.g., Amalu v. Stevens Transp., Inc.*, No. 15-CV-01116-STA-EGB, 2018 WL 6829044, at *3 (W.D. Tenn. Mar. 12, 2018), *aff'd*, No. 15-CV-01116-STA-EGB, 2018 WL 1911136 (W.D. Tenn. Apr. 23, 2018); *Asbury v. MNT, Inc.*, No. 12-

28

CV-252-KG-RHS, 2014 WL 6674475, at *6 (D.N.M. Aug. 6, 2014). Then again, his direct

experience with the specific function of vetting motor carriers for a modern brokerage operation

is more limited. Allen's core experience with vetting motor carriers is from his time as a truck

agent (analogous to a truck broker but before industry deregulation) from 1973 to 1984, a role in

which his vetting process consisted of inquiring into the motor carrier's governmental authority

and insurance coverage, though not the carrier's safety record. (*See* ECF 128-18-21, Ex. 14,

Allen Dep. at 145:1-12 (years), 151:18-22 (vetting inquiry into authority and insurance), 152:11-

22 (no safety data), 155:6-11, 124–25 and 162:9-14 (limited post-deregulation experience setting

vetting policy)).

      Still, he has attended seminars on broker liability (ECF 136-5, Ex. 2, Allen Dep. at 53:9-

19) and testified that he has kept up with industry standards even after stopping work as a truck

agent. In one instance, Allen provided informal consulting services, which included advising an

individual on the creation of a brokerage vetting policy. (ECF 128-19, Ex. 14, Allen Dep. 124:5-

22.) Although Allen gained most of his experience in a slightly different regulatory environment,

his perspective is both relevant and reliable. As a truck agent, Allen performed background

checks on drivers (*id.* at 146:15-22), investigated accidents throughout his assigned region (*id.* at

147:2-4), audited various logs (*id.* at 147:3-4), and diligently verified leasing arrangements (*id.* at

152:2-10.) To use Allen's words, he was "doing the exact same thing then as what a broker is

doing now." (*Id.* at 151:19-20.)

      "The fit between an expert's specialized knowledge and experience and the issues before

the court need not be exact." *Am. Strategic Ins. Corp. v. Scope Servs., Inc.*, Civil No. PX-15-

2045, 2017 WL 4098722, at *3 (D. Md. Sept. 15, 2017) (citing *Shreve v. Sears, Roebuck & Co.*,

166 F. Supp. 2d 378, 392 (D. Md. 2001)). Indeed, Rule 702 does not create "a schematism that

segregates expertise by type while mapping certain kinds of questions to certain kinds of experts.

Life and the legal cases that it generates are too complex to warrant so definitive a match."

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999).

Allen's tenure as a truck agent is close enough to possibly be helpful to the jury. *See*

*Daubert*, 509 U.S. at 592 (noting an expert has "wide latitude to offer opinions" so long as their

opinions have a "reliable basis in the knowledge and experience of his discipline"). In other

words, Allen has enough experience in the vetting process to conclude that Cowan's process was

deficient. *See United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (noting a district court

must ask an experiential witness to "explain how [his] experience leads to the conclusion

reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is

reliably applied to the facts"). Given the absence of an explicit national standard, his

methodology — applying his understanding of the industry standard based on his knowledge and

experience and comparing a carrier's safety data to national averages to decide on additional

scrutiny — is sufficiently reliable. *See Friendship Heights Associates v. Vlastimil Koubek, A.I.A.*,

785 F.2d 1154, 1162 (4th Cir. 1986) (architect/engineer qualified to provide expert testimony on

standard of care owed by an architect drafting relevant specifications); *Crockett v. Crothers*, 285

A.2d 612, 614 (Md. 1972) (in negligence action against engineer, standard of care was

established through expert testimony describing steps ordinarily taken by engineers preparing

plans relevant to the case).

Criticisms of Allen's qualifications and experience may undermine the weight of his

testimony, but that will be for the jury to decide. Disagreement with Allen's ultimate opinion is

not the relevant test. Given reliable methodology, cross-examination will help the jury decide

whether to credit Allen's and Bussard's (*see* § II.A.3, *infra*) or Sandberg's (*see* § III.B, *infra*)

presentations of the industry vetting standard based on their experiences. Cowan's motion to

exclude will be denied as to Allen's expert testimony on the vetting of BST.

### 3. Timothy Bussard

Finally, Cowan moves to exclude Timothy Bussard's expert witness testimony regarding

Cowan's vetting of Ben Strong Trucking. (*See* ECF 128-8, Ex. 6, Bussard Report at 11).

Bussard's opinions are:

1. Ben Strong Trucking, Inc. had a history of unsafe operations and violations.
2. Ben Strong Trucking, Inc. was an Unacceptable Risk and Unsafe Motor Carrier.
3. Cowan Systems, LLC failed to notify and/or ensure their customers, including GAF Materials that Cowan Systems, Inc. was no longer in business since 2000 and Cowan Systems, LLC would be the broker for their continuing service.
4. Cowan Systems, LLC failed to follow Nationally Recognized Standards of Care and properly utilize safety vetting websites, such as FMCSA Safer and Carrier411 to vet and monitor carriers such as Ben Strong. These failures were contributing causes that led to the subject crash that fatally injured [M.M.] and injured Paul Manion, Angela Manion, and Cierra Rice-Wilder.
5. Cowan Systems, Inc. entered a Carrier-Broker Agreement with an Unacceptable Risk and Unsafe Motor Carrier to transport brokered freight for them. These failures were contributing causes that led to the subject crash that fatally injured [M.M.] and injured Paul Manion, Angela Manion, and Cierra Rice-Wilder.

(ECF 128-8, Ex. 6, Bussard Report at 11).

As to his qualifications, Cowan argues that Bussard's resume reveals he worked for

companies with brokerage operations but that he did not work for the brokerage divisions of any

of those companies. Indeed, Bussard testified that his education and training credentials are

"broker related" but do not "specifically involve brokerage." (ECF 137-5, Ex. 3, Bussard Dep. at

32:6-7, 52:22–54:2). In his consulting work, Bussard made recommendations to brokers about

whether to hire a particular carrier or not, despite having never worked in auditing to ensure that

a broker had followed its own settled carrier selection policy. (*Id.* at 50:22–52:18).

The court is nonetheless satisfied with Bussard's qualifications and experience. Bussard has about two decades of experience working in the commercial transportation industry. (ECF 128-9, Bussard CV, at 2–3.) Bussard's wealth of experience comes in many shapes and sizes, ranging from his time as a Class A CDL Driver to his tenure as the Director of Safety at multiple transportation companies. (*Id.* at 3.) He has several endorsements and certifications from professional transportation organizations (*id.* at 4), and has completed more than a dozen training and educational courses related to his craft (*id.* at 4–5.)

Cowan's attempt to downplay Bussard's experience working in a company's "safety" division is unavailing given Bussard's testimony that "part of the safety team's job was to *vet motor carriers.*" (*Id.* at 48:6-17.) And when Bussard worked for Cowan from 2012–14 part of his job related to the brokerage operation vetting carriers. In that role, Cowan asked him to compile information about potential carriers and then send it to others who would decide whether to select that carrier. (*Id.* at 37:10–39:11). Bussard was not given authority to make recommendations to Cowan's brokerage operation (*id.*) but he would sometimes make such recommendations for Cowan's agency operation, through which Cowan would bring certain motor carriers onboard to operate under Cowan's carrier authority (*id.* at 39:12–40:18).

As with Allen's truck agent experience (*see* § II.A.2, *supra*), Bussard's experience in agency-side vetting is close enough that it may be useful to the jury, and his methodology essentially involves what his experience tells him is the industry standard — reviewing on tools like SAFER a variety of factors related to BST's fitness and engaging in further scrutiny depending on those factors. (ECF 137-3, Bussard Dep. at 171–174). His testimony will not be excluded based on his lack of specific brokerage work experience. *See Mann v. C. H. Robinson Worldwide, Inc.*, No. 7:16-CV-00102, 2017 WL 3191516, at *14–15 (W.D. Va. July 27, 2017)

(permitting expert to testify as to a broker's reasonable standard of care despite the expert having "never worked for a broker or otherwise been involved in the pragmatic decision-making of brokers"). Robust cross-examination will help the jury ascertain what weight to give Bussard's expert testimony. Bussard's vetting-related opinions will not be excluded.

### B. Plaintiffs' Motion to Exclude Annette Sandberg's Expert Testimony

The Manion plaintiffs and Ortiz also moved to exclude the testimony of Cowan's expert witness, Annette Sandberg, regarding registration requirements under MAP-21 and Cowan's vetting of BST (ECF 129, Manion Pl.'s Mot.; ECF 133-1, Ortiz's Pl.'s Mot.; ECF 138, Cowan's Omnibus Resp.; ECF 142-1, Ortiz's Reply; ECF 143, Manion Pl.'s Reply). Sandberg's testimony and expert witness report conclude in relevant part that MAP-21 did not require Cowan to follow the separate registration provisions because MAP-21 was targeted at carriers without preexisting broker authority, and because the Secretary had not created rules to implement the statute's provisions. (*See* ECF 129-2, Sandberg Report, at ¶¶ 82–97). According to the plaintiffs, Sandberg is not qualified, and she states an ipse dixit legal conclusion that is unreliable and without sufficient factual basis.

Sandberg is manifestly qualified by way of her time as Deputy Administrator of the National Highway Traffic Safety Administration (NHTSA), Deputy Administrator of the Federal Motor Carrier Safety Administration (FMCSA), Acting Administrator and later Administrator of the FMCSA, and a compliance consultant since 2006 for commercial motor carriers, shippers, and brokers. (*Id.* ¶¶ 2-16). She has worked with 50–60 brokers on vetting and selection of commercial motor carriers, and she has authored or co-authored articles in various journals and

33

trade publications. Her knowledge of carrier vetting[10] is sufficient to qualify her as an expert. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). She describes the commonly used "base standard" that industry brokers use in selecting carriers (ECF 129-2, Sandberg Report, at ¶¶ 35–37) and considers the steps Cowan took beyond those baseline steps (*id.* ¶¶ 37–38). As with Allen and Bussard, these opinions may embrace ultimate issues of Cowan's alleged negligence, but they remain admissible. "We identify improper legal conclusions by determining whether 'the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.'" *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) (quoting *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002)). Sandberg's opinions on carrier vetting do not directly involve terms with similar legal significance. Nor do they simply "tell the jury what result to reach." *Barile*, 285 F.3d at 760. Instead, they will help the jury understand industry standards in carrier vetting. *See Kopf*, 993 F.2d at 377. With no single national vetting standard, Sandberg's testimony about the industry standard based on her experience will help the jury decide which expert to credit when assessing the standard of care. Sandberg's expert witness opinions on Cowan's vetting will be admitted.

### III. **Motion to Strike**

Finally, the plaintiffs filed on December 29, 2021, a motion to strike Cowan's April 2021 errata sheet to Daniel Evans's February 2021 corporate designee deposition testimony, which cited as the reason for the amendment that he had relied on his earlier answers to the plaintiffs'

---

[10]      As noted *supra*, expert witness opinions on MAP-21's application will be excluded as legal conclusions not useful to the jury. It is worth noting that Sandberg's expert report lays out a coherent narrative of MAP-21's purpose and history. It highlights that FMCSA had not promulgated re-registration regulations as the MAP-21 statute directed, that Cowan's 1994 and 1995 (transferred in 2000) carrier and broker authorities remained active even if they shared a common number, and that a number of other prominent transportation companies held carrier and broker registrations under the same name and registration numbers. (ECF 138-2, Sandberg Report at 11 n.47).

interrogatories — answers that had "now been clarified." (ECF 141-5, Ex. 3, Errata Sheet). In the

interrogatories, Evans (for Cowan) had answered that BST had been rated as satisfactory at the

time of selection. (ECF 141-3, Ex. 1, Cowan's Answers to Interrogatories, at ¶ 5.) After the

February 2021 deposition, Cowan's counsel investigated the issues and learned that both the

interrogatories and Evans's deposition were wrong in that regard. (ECF 152, Cowan Opp., at 2).

In April 2021, Cowan submitted the errata changing "satisfactory" to "unrated" in two places in

Evans's deposition and amending the interrogatories. The Court Reporter's email went to

plaintiffs' counsel's spam folder (ECF 141, Mot. Strike at 3 n.1), and discovery as to liability

closed in June 2021, except for a continuation of Roger Allen's deposition (ECF 124, Order

Confirming Results of Conf. Call). The plaintiffs filed this motion to strike in late December

2021 after seeing references to the errata in the summary judgment briefing.

Cowan argues that the errata do not provide more detailed or more favorable answers but

rather merely correct Evans's error; whether Cowan believed BST to be "satisfactory" or

"unrated" would have had no effect on the outcome of Cowan's vetting policy. Later in the

February deposition, Evans had testified consistently with the future errata sheet by saying that

to be activated in Cowan's system, a carrier must meet all of Cowan's qualifications, including

either a satisfactory rating or unrated status. (ECF 137-7, Ex. 5, Evans Dep., at 147:1-6). The

plaintiffs counter that an "unrated" label would trigger additional scrutiny under Cowan's vetting

policy, and those additional steps are at issue in this case.

Under Rule 30(e) a deponent is permitted to review their deposition transcript and "if

there are changes in form or substance, to sign a statement listing the changes and the reasons for

making them." Fed. R. Civ. P. 30(e). The Fourth Circuit has not opined on the permissible scope

of alterations under the rule, and while "[a] majority of courts interpret Rule 30(e) literally to

allow any timely, substantive change for which a reason is given[,]" this court has followed a "growing minority [that] recognizes limitations to the scope of permissible changes to deposition testimony[.]" *Harden v. Wicomico Cnty.*, 263 F.R.D. 304, 307–08 (D. Md. 2009); *see also Wyeth v. Lupin Ltd.*, 252 F.R.D. 295, 296–97 (D. Md. 2008); *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 267–68 (3d Cir. 2010); *Brittney Gobble Photography, LLC v. Sinclair Broadcast Grp., Inc.*, No. SAG-18-3403, 2020 WL 761174, at *4 (D. Md. Feb. 14, 2020). This district has distinguished between substantive changes that "correct misstatements or clarify existing answers" and those that "materially change the answers or fully supplant them," permitting the former and barring the latter. *Green v. Wing Enters., Inc.*, No. 1:14-CV-01913-RDB, 2015 WL 506194, at *2 (D. Md. Feb. 5, 2015) (citing *Wyeth*, 252 F.R.D. at 297). The adequacy of the reason given for the change and the prejudice of striking the correction are also relevant in determining whether to strike a deponent's proposed changes. *Id.* The court is more likely to strike the proposed change if the reason provided is conclusory. *See id.*

The court credits Cowan's assertion that the disputed changes were corrections of genuine errors rather than sham affidavits constructed to create disputes of fact or attempts to treat the deposition as a "take-home" examination by providing terse deposition answers and later fleshing them out with strategic, lawyerly detail. *See, e.g., Brittney Gobble*, 2020 WL 761174, at *6 (citing *Wyeth*, 252 F.R.D. at 296–97; *Harden*, 263 F.R.D. at 307–08). Still, these changes quite literally contradict Evans's testimony, and the reason provided on the errata sheet is paradigmatically conclusory. Although the court notes the timeliness of Cowan's changes and the delay of the plaintiffs' motion to strike, the fact in question does not determine the outcome of the summary judgment motions, and the fact that the original answer stands will not prevent

Evans from offering an explanation at trial to explain or otherwise attempt to mitigate the effects of his answer. *See Wyeth*, 252 F.R.D. at 297.

Accordingly, the plaintiffs' motion to strike will be granted.

## CONCLUSION

For the reasons discussed above, the cross-motions for summary judgment and the motions in limine will be granted in part and denied in part, and the motion to strike will be granted. A separate Order follows.

_8/29/22_
Date

_CCB_
Catherine C. Blake
United States District Judge

37